**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA FORT LAUDERDALE DIVISION CASE NO.:**

SFR SERVICES L.L.C. and RICKY MCGRAW,

Plaintiffs,

v.

TOWER HILL INSURANCE GROUP, LLC, TOWER HILL SELECT INSURANCE COMPANY, TOWER HILL PRIME INSURANCE COMPANY, OMEGA INSURANCE COMPANY, ZINOBER, DIANA & MONTEVERDE, P.A., CARL NEMETH, GLEN CLASEN, and REBECCA PRINCE-SWIFT,

Defendants.

_______________________________________/

**COMPLAINT**

Plaintiffs SFR Services L.L.C. ("SFR") and Ricky McGraw ("McGraw" and collectively, "Plaintiffs"), bring this action against Tower Hill Insurance Group, LLC ("THIG"), Tower Hill Select Insurance Company ("TH Select"), Tower Hill Prime Insurance Company ("TH Prime"), Omega Insurance Company ("Omega" and together with "THIG", "TH Select", "TH Prime", and "Omega", the "Tower Hill Entities"), Zinober, Diana & Monteverde, P.A. ("Zinober"), Carl Nemeth ("Nemeth"), Glen Clasen ("Clasen"), and Rebecca Prince-Swift ("Prince-Swift" and collectively, "Defendants"), and allege:

## INTRODUCTION

1. This is a case involving a multi-year pattern of racketeering activity, fraud malicious prosecution, and abuse of process in which the Defendants concocted facts and legal theories to pursue Plaintiffs and destroy their business.[1]

2. Defendants engaged in a scheme of misconduct to destroy Plaintiffs' business through a pattern of fraud, coercion, shifting narratives, and suppression of evidence. Defendants all had specific roles in the scheme, which were well-coordinated, well-developed, and comprised a long-running strategy to destroy Plaintiffs' business by any and all means at their disposal.

3. By fraudulently inducing SFR to resolve hundreds of Hurricane Irma insurance claims, the Tower Hill Insurance Collective (defined below) and Zinober manufactured Tower Hill's damages so they could thereafter sue Plaintiffs to claw back the settlement proceeds and then try to profit from the endeavor by claiming treble damages and attorneys' fees.

4. Zinober convinced the Tower Hill Insurance Collective to join the scheme and be the Plaintiffs as an "opportunity" to create "affirmative claims" against Plaintiffs.

5. To be sure, the Tower Hill Insurance Collective and Zinober filed the lawsuit, sent court filings and correspondence to and from this District, directed and conducted discovery over state lines, and engaged in communications by interstate e-mail and telephone. All of this conduct

---

[1] This case is, in part, a RICO suit against a law firm based on a multi-year pattern of racketeering activity, which is not the first of its kind. *See, e.g., CSX Transp., Inc. v. Gilkison*, 2012 WL 1598081, at *3 (N.D.W.Va. May 3, 2012); *Garlock Sealing Techs., LLC v. Shein*, 2015 WL 5155362, at *2 (W.D.N.C. Sept. 2, 2015); *J-M Mfg. Co., Inc. v. Simmons Hanly Conroy, LLP*, 2025 WL 843854, at *4 (N.D. Ill. Mar. 18, 2025) (Complaint subsequently amended and Motions to Dismiss are currently pending); *Uber Technologies, Inc. v. Simon & Simon P.C., et al.*, 2026 WL 1284178 (E.D.Pa. May 11, 2026) (Motions to Dismiss denied); and *Uber Technologies, Inc. v. Wingate, Russotti, Shapiro, Moses & Halperin, LLP, et al.*, 2025 WL 750838 (E.D.N.Y. Jan. 30, 2025) (Motions to Dismiss pending).

was to further the scheme, which included the negotiation and payment of the settlements regarding the underlying insurance claims.

6. Next, the Tower Hill Insurance Collective and Zinober perpetuated the litigation for over 6 years by repeatedly and continuously increasing and decreasing the number of insurance claims, as well as adding and dismissing parties and claims haphazardly.

7. SFR, McGraw, Jessica McGraw (McGraw's wife), McGraw Asset Management, LLC (a real estate entity that never had any connection to insurance claims), Matt McGraw (McGraw's brother), McGraw Property Solutions, LLC (an entity that never wrote estimates and was generally not involved with the insurance claims), Elite Claims Consultants, LLC (Matt McGraw's public adjusting entity), and Will Mynatt (a former SFR salesman) were all named as Defendants at various times through the many iterations of the lawsuit (discussed below).

8. Eventually, the civil lawsuit filed by the Tower Hill Insurance Collective and Zinober was severed into 5 separate cases with many of the parties being dropped from the actions. At all times, the lawsuit was used as a discovery device to coordinate efforts with the Department of Financial Services so that McGraw could be criminally prosecuted. This piece of the scheme was organized, conducted, operated, and managed by Nemeth, Clasen and Prince-Swift.

9. These individuals constantly and rather obsessively relayed information to the prosecuting authorities regarding McGraw's criminal case even though they gave contradictory testimony throughout the proceedings and several witnesses recanted their testimony. After McGraw's criminal prosecution lasted over 2 years and destroyed Plaintiffs' business, the State dismissed the criminal case 1 week prior to trial citing a lack of evidence.

10. And now, in 2026, after Defendants achieved their goal of destroying Plaintiffs' business through illicit means, the Tower Hill Insurance Collective elected to dismiss the two of the severed actions – TH Select and Omega – after over 6 years of litigation and after Plaintiffs spent a fortune in attorneys' fees. All of Defendants' conduct goes well past routine litigation activities; it is fraud and Defendants should be held liable.

## PARTIES

11. At all times material hereto, Plaintiff SFR was and is a Florida limited liability company duly registered and authorized to do business throughout the State of Florida, with its principal address located in Martin County, Florida. SFR has one member, Ricky McGraw, a citizen of Puerto Rico. Ricky McGraw's domicile is in Dorado, Puerto Rico because he has a true, fixed permanent home, and principal establishment in Puerto Rico and to which he intends to return whenever he is absent from it.

12. Plaintiff McGraw is a citizen of Puerto Rico and his domicile is in Dorado, Puerto Rico. McGraw has a true, fixed permanent home, and principal establishment in Puerto Rico and to which he intends to return whenever he is absent from it.

13. Defendant THIG is a Florida limited liability company with its principal place of business in Alachua County, Florida. The Members of THIG are (i) Tower Hill Insurance Group II, Inc. ("THIGII"), a Florida corporation with its principal place of business in Alachua County, Florida; (ii) RRV U.S. Holdings, LLC ("RRV"), a Bermuda company with no members domiciled in Puerto Rico; (iii) Alachua Capital Corporation, a Florida corporation with its principal place of business in Alachua County, Florida; and (iv) ICS Software Acquisition, Inc., a Florida corporation with its principal place of business in Alachua County, Florida.

14. Defendant TH Select is a dissolved Florida corporation with it previous principal place of business located in Alachua County, Florida.

15. Defendant Omega is a dissolved Florida corporation with its previous principal place of business in Alachua County, Florida.

16. After TH Select and Omega merged into Tower Hill Signature in 2020, the former companies ceased doing business because TH Signature was the surviving entity. After TH Signature merged into TH Prime in 2023, TH Signature ceased doing business as well. As of 2025, TH Prime is the only insurance company that is actively operating. In this connection, TH Select, TH Signature, and Omega are the property of TH Prime. Consequently, TH Prime is the owner of the rights, assets, debts, and liabilities of TH Select, TH Signature, and Omega, and thus a party in this case as the successor-in-interest to TH Select, TH Signature, and Omega.

17. Defendant Zinober is a Florida incorporated professional association – a Florida profit corporation in and pursuant to Florida law – with its principal place of business in St. Petersburg, Florida, which is located in Pinellas County, Florida. Zinober has offices in Tampa, Florida and Fort Lauderdale, Florida as well. None of the shareholders are domiciled in Puerto Rico. A substantial part of the conduct asserted herein arose from Zinober's Fort Lauderdale, Florida office. Thus, for the above reasons, Zinober is a citizen of Florida.

18. Defendant Nemeth is an individual and a Florida citizen, who resides in Alachua County, Florida and is otherwise *sui juris.*

19. Defendant Clasen is an individual and a Florida citizen, who resides in Lee County, Florida and is otherwise *sui juris*.

20. Defendant Prince-Swift is an individual and a Florida citizen, who resides in Lee County, Florida and is otherwise *sui juris*.

**JURISDICTION AND VENUE**

21. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because the claims herein arise under the laws of the United States, pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1964(c), and because the claims herein seek recovery for violations of 18 U.S.C. §1962.

22. This Court also has subject matter jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and is between citizens of different States.

23. In addition, this Court has subject matter jurisdiction over the common law claims asserted herein pursuant to 28 U.S.C. §1367(a), because those claims are so related to the claims arising under the law of the United States that they form part of the same case or controversy.

24. This Court is a proper venue for this action under 28 U.S.C. §1391(b)(2) because a substantial part of the acts and omissions giving rise to this dispute occurred within this judicial district and division. This Court also is a proper venue for this action under 18 U.S.C. §1965(a) because one or more Defendants resides in this District, is found within this District, has an agent in this District, or transacts affairs in this District.

25. This Court has personal jurisdiction over each of the Defendants because this cause of action arises out of some action or contact by each of them in this District or relates to the contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

## FACTUAL BACKGROUND

### A. The First Part of the Scheme – The Tower Hill Insurance Collective Fraudulently Induced SFR and McGraw to Resolve Hundreds of Insurance Claims.[2]

26. **The alleged scheme started** by the TH Entities, along with Tower Hill Signature Insurance Company ("TH Signature") and Tower Hill Preferred Insurance Company ("TH Preferred" and together with "TH Signature" and the "TH Entities," the "Tower Hill Insurance Collective" or "Tower Hill"), fraudulently inducing SFR into resolving hundreds of underlying property damage claims and lawsuits stemming from Hurricane Irma.

27. Hurricane Irma occurred in 2017. The settlements occurred between approximately 2018-2022, and were negotiated/approved by THIG since none of the Insurance Companies (identified below) had any employees.

28. The individuals involved on behalf of THIG regarding this part of the scheme were, upon information and belief, Sam Townsend, Michael Moureau, Scott Rowe, and Lincoln Levarge, among others.

29. Plaintiffs damages were not realized regarding the TH Select and Omega cases until 2026 when those lawsuits were dismissed by these respective insurance carriers.

---

[2] In fact, the Insurance Companies have a history of intentionally undervaluing and denying legitimate claims, and the State Court Action was just one more strategy undertaken by the Tower Hill Insurance Collective to wrongfully increase their profitability. *See Malysa v. Tower Hill Prime Ins. Co. et al.*, Case No. CACE18-021110 (Fla. 17th Cir. Ct. 2018) (RICO action against Tower Hill and its co-conspirator engineer and insurance adjustor related to their criminal conspiracy to deny or significantly undervalue Hurricane Irma claims); *Siegel v. Tower Hill Signature Ins. Co.*, 225 So. 3d 974, 978 (Fla. 3d DCA 2017) (rejected Tower Hills' argument that an insurer is able to unilaterally determine, as a matter of law, the actual cash value or replacement cost value by simply paying its own independent adjuster's estimate of the insured loss, less the deductible); *Francis v. Tower Hill Prime Ins. Co.*, 224 So. 3d 259, 262 (Fla. 3d DCA 2017) (same); *Escobar v. Tower Hill Signature Ins. Co.*, 226 So. 3d 1084, 1084-85 (Fla. 3d DCA 2017) (same).

30. The damages sought as part of this case are the attorneys' fees and costs incurred in connection with the prosecution of the State Court Action as it pertains to TH Select and Omega (pre and post-severance).

31. Many of these insurance claims and lawsuits were ultimately compromised through the execution of settlement agreements (identified below), which were paid by the Tower Hill Insurance Collective and negotiated principally by Zinober, with Michael Monteverde, Esq. ("Monteverde") at the helm. **This was the first part of the scheme**.

**B. The Second Part of the Scheme – Filing the State Court Action Based on Damages the Tower Hill Insurance Collective Manufactured.**

32. After the Tower Hill Insurance Collective settled the overwhelming majority of these lawsuits for a price they negotiated, **the second part of the scheme involved** the Tower Hill Insurance Collective suing Plaintiffs for the money paid plus treble damages and attorneys' fees under various legal theories such as the Florida Deceptive and Unfair Trade Practices Act, Florida civil RICO, conspiracy, insurance fraud, and common law fraud.

33. The end goal was to destroy Plaintiffs and their business. Zinober convinced the Tower Hill Insurance Collective to join the scheme and be the Plaintiffs as an "opportunity" to create "affirmative claims" against Plaintiffs.

34. The lawsuit was drafted and filed by Zinober (also with Monteverde at the helm) in the Circuit Court in and for Martin County Florida in 2020 and styled *Tower Hill Signature Insurance Company et al. v. SFR Services L.L.C. et al.*, Case No. 2020-000409-CA (the "State Court Action" or the "2020 RICO Lawsuit").

35. TH Signature, TH Prime, TH Preferred, TH Select, and Omega (the "Insurance Companies") were all Plaintiffs in the State Court Action. Since none of the Insurance Companies

had any employees, THIG was the entity on behalf of Tower Hill that managed the State Court Action.

36. Zinober was counsel of record for the Insurance Companies. The gist of the State Court Action was that the SFR Defendants engaged in a scheme to submit allegedly inflated estimates to the Insurance Companies regarding work to be performed on homes damaged by Hurricane Irma.

37. Since none of these Insurance Companies had any employees, THIG controlled the Insurance Companies' State Court Action, and handled interactions with Zinober, which included Nemeth (the Director of THIG's Special Investigations Unit that handles alleged insurance fraud). THIG and Zinober spearheaded the effort against SFR and McGraw from the Insurance Companies' perspectives.

38. Critically, the State Court Action began as a massive lawsuit with all 5 Insurance Companies as Plaintiffs seeking approximately $20 Million ($60 Million inclusive of treble damages, but exclusive of attorneys' fees).

39. The Insurance Companies (operating through THIG) and Zinober manufactured their own alleged damages through the resolution and payment of the underlying property damage insurance claims and lawsuits, and thereafter sought to profit from the very same negotiated resolutions by seeking the return of the money paid, plus treble damages and attorneys' fees.

40. There were various iterations of the State Court Action that has lasted over 6 years and involved substantially increasing and decreasing the claims at issue over time as follows:

(i) 192 insurance claims in the Initial Complaint – filed May 6, 2020;

(ii) 192 in the Amended Complaint – filed June 25, 2020;

(iii) 361 in the Second Amended Complaint – filed March 22, 2021;

(iv) 216 after an updated list was filed– filed February 28, 2023;

(v) 216 in the Third Amended Complaint – filed June 17, 2024;

(vi) 63 pursuant to a Court Order – filed August 30, 2024; and

(vii) 62 in the Revised Third Amended Complaint – filed October 23, 2204;

41. The State Court Action was ultimately severed into 5 separate lawsuits – **each filed on April 17, 2025**. THIG and Zinober were the masterminds of this part of the scheme, especially since the Insurance Companies did not have any employees.

42. THIG was the Managing General Agent of each of the carriers. Copies of the releases (pre-and post-filing of the State Court Action) are set forth in **Exhibits 1 and 2**, respectively.[3] Below is critical data related to the 62 claims.

[3] Given the releases constitute settlements and many expressly contain confidentiality provisions, Plaintiffs filed a Motion to File Exhibits 1 and 2 Under Seal.

| | | | | |
|---|---|---|---|---|
| | | | Red = after Rico Suit (5/6/20) | |
| | | | | |
| | | **Date Release Signed** | **Payment with No Release?** | **Roof Done By SFR?** |
| **TH Sig.** | Claim No. 3300304639 (Wuerth) | | Y | |
| | Claim No. 3300309093 (Tofte) | | Y | |
| | Claim No. 3300221656 (Williams) | 12/3/2018 | | |
| | Claim No. 3300334995 (Craig Family) | 2/19/2021 | | |
| | Claim No. 3300232955 (Tagney) | | Never paid by TH | N |
| | Claim No. 3300327215 (Russell) | 3/8/2021 | | |
| | Claim No. 3300301863 (Purves) | 2/25/2019 | | N |
| | Claim *No. 3300256766 (Banning)* ***PREFERRED*** | | Y | |
| **TH Sig.** | Claim No. 3300324147 (Jones) | 1/24/2020 | | |
| | Claim No. 3300309090 (Paton) | | Y | |
| | Claim No. 3300294441 (Schrieber) | 8/1/2019 | | |
| | Claim No. 330036306 (Labricciosa) | 6/3/2021 | | |
| | Claim No. 3300290835 (Napoli) | 12/11/2019 | | |
| | Claim No. 3300307353 (Miller) | 2/1/2021 | | N |
| | Claim No. 330028081 (Delgrippo) | 11/20/2019 | | |
| | Claim No. 3300308812 (Appleton) | | Never paid by TH | N |
| | Claim No. 3300306136 (Barry) | 11/30/2022 | | |
| | Claim No. 3300308282 (Stoltzfus) | 11/2/2020 | | |
| | Claim No. 3300277085 (Borselli) | 2/28/2020 | | |
| **TH Select** | Claim No. 3300331100 (Nemani) **3300350474** | 12/29/2020 | | |
| | Claim No. 3300306604 (Robinson) | 7/29/2021 | | |
| **TH Sig.** | Claim No. 3300305425 (Wicker) | 8/4/2022 | | N |
| | Claim No. 3300260697 (Parks) | 9/9/2019 | | |
| | Claim No. 3300307059 (Kraengel) | 11/19/2019 | | N |
| | Claim No. 3300319436 (Johnston) | 9/25/2020 | | |
| | Claim No. 3300292906 (Blechner) | 8/31/2020 | | |
| | Claim No. 330030892 (Boloy) | 8/25/2021 | | |
| **TH Prime** | Claim No. 3300241125 (Williams) | | Y | |
| | Claim No. 3300304639 (Thom) **3300238887** | 4/24/2019 | | |
| | Claim No. 3300344946 (Storm) | 10/30/2020 | | |
| | Claim No. 3300291529 (Savarese) | 1/5/2019 | | |
| | Claim No. 3300346400 (Schorr) | 1/29/2021 | | |
| | Claim No. 3300309152 (Messana) | | Never paid by TH | N |
| | Claim No. 3300335903 (McGinness) | 9/25/2020 | | |
| | Claim No. 3300288017 (Berryman) | | Y | |
| | Claim No. 3300286782 (Arch/Kullman) | 12/13/2018 | | |
| | Claim No. 3300282452 (Vickaryous) | 5/14/2020 | | |
| | Claim No. 3300329768 (Streeter) | 4/20/2022 | | N |
| | Claim No. 3300278602 (Stahl) | | Y | |
| | Claim No. 3300309909 (Sica) | 10/27/2022 | | N |
| | Claim No. 3300237978 (Hack) | | Never paid by TH | N |
| | Claim No. 3300262700 (Larkin) | 2/6/2019 | | |
| | Claim No. 3300283218 (Patton) | 11/8/2018 | | |
| | Claim No. 3300246060 (Gervace) | | Y | |
| | Claim No. 3300241215 (Trykoff) | 12/17/2020 | | |
| | Claim No. 3300333934 (Pfadenhauer) | 12/11/2020 | | |
| | Claim No. 3300248615 (Smith/Bishop, Karen) | 7/31/2019 | | |
| | Claim No. 3300278160 (Lazzara-Morrison) | 11/20/2019 | | |
| | Claim No. 3300285084 (Oakey) | 4/3/2020 | | |
| | Claim No. 330030566 (Bigeleisen) **3300305668** | 10/17/2019 | | |
| | Claim No. 3300334167 (Dent) | 4/6/2021 | | |
| | Claim No. 3300280875 (Ach) | 2/12/2020 | | |
| | Claim No. 3300256283 (Rus) | | Never paid by TH | N |
| | Claim No. 3300287714 (Lyba) | 4/30/2020 | | |
| | Claim No. 3300246302 (Patullo) | 7/20/2021 | | |
| | Claim No. 3300321665 (Fertel) | 7/30/2021 | | |
| | Claim No. 3300319287 (Narcise) | 4/20/2021 | | |
| | Claim No. 3300309724 (Summers) | | Y | |
| | Claim No. 3300225515 (Dendis) | Sometime in 2019 | | |
| | Claim No. 3300235736 (Kraft) | 1/29/2020 | | |
| **Omega** | Claim No. 3300291572 (Bortz) | | Y | |
| | Claim No. 3300284769 (Canzona) | 5/2/2019 | | N |

43. At or around each of the above dates, representatives from the Zinober law firm, individually, and on behalf of the Tower Hill Insurance Collective sent e-mails and settlement/release agreements (dated above) to SFR to resolve the above underlying property damage claims. Zinober and the Tower Hill Insurance Collective, acting in concert, intended Plaintiffs to rely on these agreements so that Plaintiffs believed the insurance claims and related disputes would be fully and finally resolved.

44. Unbeknownst to Plaintiffs, Zinober and the Tower Hill Insurance Collective had already devised a scheme to sue Plaintiffs (i.e., State Court Action) to claw back and recoup the payments made to Plaintiffs and to use the resolutions to claim unfounded treble damages and attorneys' fees.

45. Zinober and the Tower Hill Insurance Collective benefitted from this scheme in that they destroyed Plaintiffs' business, which prevents Plaintiffs from working in the property damage insurance industry in the future. Zinober additionally reaped the rewards of attorney's fees in the underlying insurance claims disputes and related litigation, as well as attorneys' fees in the State Court Action.

46. With regard to the insurance claims, 23 out of 62 (38%) involve payments and releases that were signed before the State Court Action was filed and 24 out of 62 (37%) involve payments and releases that were signed after the State Court Action was filed. Thus, 47 of 62 claims (75%) at issue involved written releases.

47. An additional 10 of 62 claims were paid by the Insurance Companies without any release. Thus, 57 of the 62 claims (92%) were paid by the Insurance Companies where the purpose was to fully and finally resolve any outstanding controversies regarding the insurance claims.

48. Furthermore, 12 out the 62 claims (19%) involve work that was performed by some other contractor and not SFR and yet, the Insurance Companies sued SFR and McGraw concerning these claims.

49. In 5 out of the 62 claims (8%), the Insurance Companies did not pay any money to anyone. It was a mystery how the Insurance Companies were damaged in this category.

**Deposition Testimony in the State Court Action**
**Demonstrated the Complaint Had No Basis in Reality.**

**Sam Townsend**

50. Sam Townsend testified as a corporate representative for THIG regarding its corporate structure. Each of the five carrier Plaintiffs does not have any employees. Depo. of Sam Townsend, **Exhibit 3**, 10-6-25, at 7:22-25.

51. THIG is the Managing General Agent for each of the carriers, this case is being handled by THIG, and the decision to file the lawsuit was apparently made by THIG. *Id.* at 22:4-6; 26:5-8; 27:23-25. Yet, Townsend did not know who at THIG authorized the lawsuit. *Id*. at 28:2-6; 30:7-15, 22-23; 31:11-15. In fact, nobody reviewed the lawsuit before it was filed. *Id.* at 32:5-19.

52. Sam Townsend also testified as the corporate representative for TH Signature. Since TH Signature does not have any employees, neither Ricky McGraw, Matt McGraw, Elite Claims, McGraw Property, nor Will Mynatt (were Defendants in various iterations of the State Court Action) have spoken to anyone at Tower Hill. Depo. of Sam Townsend, July 24, 2025, **Exhibit 4**, at 11:22-25. – 12:8-20. While Townsend could not identify any of the desk adjusters on any of the 19 claims at issue, Tower Hill Signature had the ability to investigate all of the claims *Id.* at 17:5-9; 29:13-17. Significantly, he had no idea who authorized the lawsuit on behalf of TH Signature

and Townsend acknowledged that Tower Signature does not exist as a corporate entity. *Id.* at 21:21-25; 22:9; 23:12-13.

53. Sam Townsend testified as the corporate representative for TH Prime too. He testified that Tower Hill always had the ability to evaluate roof estimates submitted by SFR by comparing them against their estimating software, speaking to other roofers, retaining independent adjusters or engineers, and a myriad of other ways. Depo of Sam Townsend, 2-17-25, **Exhibit 5**, at 109:5-13; 145:23-25 – 146:1-16.

54. Claims were paid based on this process and through negotiated settlements with SFR. *Id.* at 145:23-25 – 146:1-16. Furthermore, he did not recall McGraw Property ever submitting an estimate to Tower Hill. *Id.* at 115:8-12. Critically, Townsend also testified Tower Hill settled numerous claims at issue after concluding, in 2018, that SFR allegedly committed fraud by submitting inflating estimates to Tower Hill. Depo. of Sam Townsend, 4-9-25, Vol. 3, **Exhibit 6**, at 45:5-6, 9-16.

**Dan Tadrowski**

55. Dan Tadrowski also testified as a corporate representative for THIG regarding its corporate structure. After TH Select and Omega merged into Tower Hill Signature in 2020, the former companies ceased doing business because TH Signature was the surviving entity. Depo. of Tadrowski, **Exhibit 7**, at 26:2-4; 30:9-11. After TH Signature merged into TH Prime in 2023, TH Signature ceased doing business as well. *Id.* at 30:12-13; 34:3-6, 12-15. As of 2025, TH Prime is the only insurance company that is actively operating. *Id.* at 34:16-20.

56. In this connection, TH Select, TH Signature, and Omega would be the property of TH Prime. *Id.* at 37:5-11. Thus, TH Prime is the owner of the rights, assets, and debts of TH Select, TH Signature, and Omega. *Id.* at 38:8-15; 40:4-13; 115:12-22; 129:6-12. Tadrowski had no idea

how TH Select, Omega, or TH Signature had the authority to file the lawsuits or who read the various iterations of the Complaints pre and post-severance. *Id.* at 41:3-25 – 42:15; 43-52. Significantly, he conceded there could be legal issues as to whether they were proper parties in the lawsuit filed in 2020 and through to the present day. *Id.* at 41:19-21.

57. Moreover, Tadrowski did not know if the board of directors for the Insurance Companies were ever informed about the filing of any of the lawsuits at issue at any point in time with respect to the various iterations of the Complaints. *Id.* at 63:1-6. He also acknowledged that THIG is the Managing General Agent for the carriers here. *Id.* at 66:13-17.

**Carl Nemeth**

58. Carl Nemeth testified as another corporate representative for THIG. He testified as the Assistant Vice President for the Special Investigations Unit (SIU). Nemeth Depo., **Exhibit 8**, at 11:13-24. He is the highest ranking person in the SIU and handles fraud investigations, claims compliance, and regulatory compliance. *Id.* at 11:15-18; 12:17-20. Nemeth never saw an estimate written by Ricky McGraw. *Id.* at 23:13-17. He had no idea whether Ricky McGraw prepared any estimates, negotiated with insurance adjusters, paid subcontractors, or threatened litigation against any of the carrier Plaintiffs. *Id.* at 24:5-22. His testimony was critical for several reasons, the most important of which was the time period when Tower Hill believed SFR's estimates were inflated.

59. ***SIU investigated SFR from 2017-2020 regarding its allegedly inflated estimates. Id. at 40:2-10. Most importantly, SIU became aware in 2018 that SFR was allegedly submitting inflated estimates to Tower Hill. Id. at 30:15-18, 24-25 – 31:1-3***. At this time in 2018, THIG noticed that SFR was submitting an abundance of claims via Assignments of Benefits (AOBs) and it observed a trend in litigation being pursued. *Id.* at 30:20-23. Yet, neither he nor anyone within SIU ever informed the claims adjusters that SIU believed SFRs estimates were inflated. *Id.* at 31:4-

10. As a result, the fact that SIU believed SFR estimates were inflated did not prohibit or inhibit the adjusters from resolving claims. *Id.* at 34:11-15.

60. Additionally, the information used to prepare the 2020 lawsuit was gathered and known in 2018. *Id.* at 39:13-17, 19-25. The Vice President of Claims requested SIU to contact Zinober, Diana & Monteverde, P.A. (Tower Hill's counsel in this case) to look into the issues related to the 2020 RICO Lawsuit. *Id.* at 51:24-25 – 52:1-6. Michael Monteverde, Esq., counsel of record for the Insurance Companies in the State Court Action, was involved in the Department of Financial Services (DFS) investigations that were occurring simultaneously with the prosecution of the civil RICO case. *Id.* at 61:17-20; 62:12-18.

61. While SIU believed in 2018 that SFR's estimates were inflated, Nemeth testified that $1,800-$2,200/sq is not per se fraudulent without more information. *Id.* at 101:21-25 – 102:1-2, 5-8, 16-19. In 2020, after the carriers filed the 2020 RICO Lawsuit, THIG believed the civil case involved alleged criminal activity. *Id.* at 107:5-10. Yet, THIG's investigation stopped after the 2020 State Cout Action was filed because THIG believed it knew exactly what was needed to prove the purported fraud. *Id.* at 110:1-5. In fact, during a 2021 meeting with Beth Blechman (a DFS investigator), THIG inquired whether DFS wanted 350 referrals for inflated estimates because THIG concluded the practice occurred on all files based on the THIG investigation that lasted years before the filing of the 2020 RICO Lawsuit. *Id.* at 121:5-12.

62. During the pendency of the civil RICO case, Kyle Abernathy, an employee in the SIU, provided documents to DFS regarding a criminal investigation he pursued against SFR and Ricky McGraw. *Id.* at 125:13-17. Furthermore, Nemeth prepared a PowerPoint presentation in 2021 for DFS to articulate THIG's alleged findings regarding SFR and what it concluded were inflated estimates. *Id.* at 132:16-19; 133:3-6. Yet, during this presentation, none of the other

Defendants in this case were discussed because the meeting solely concerned SFR as the target. *Id.* at 155:3-25; 158:10-12.[4]

63. Nemeth had no personal knowledge about any of the other Defendants, their involvement in the alleged scheme, or why the carrier-Plaintiffs sued them in the first place. *Id.* at 169:8-25 – 170:1-2. From the beginning, he had no knowledge of any wrongdoing committed by Jessica McGraw, Will Mynatt, McGraw Property Solutions, LLC, Matt McGraw, or Elite Claims Consultants, LLC. Id. at 185:14-25 – 186:1-2. His testimony was quite perplexing in this regard since there is no department or unit within THIG, other than the SIU, that investigates alleged insurance fraud. *Id.* at 192:23-25 – 193:1, 12-17.

**Bruce Steptoe**

64. Bruce Steptoe, one of Tower Hill's litigation adjusters for some of the claims at issue, testified at length about SFR. He adjusted over 100 SFR claims, and collectively all of them involved each of the carrier Plaintiffs that filed the 2020 RICO Lawsuit. Depo. of Steptoe, 10/5/21, **Exhibit 10**, at 34:4-25 – 35:9; 100:19-22. Steptoe did not handle SFR claims differently than any other hurricane claim and no one at Tower Hill told him to scrutinize SFR claims more than other contractor claims. *Id.* at 99:12-19. Sam Townsend, Tower Hill's corporate representative, never told Steptoe that SFR or Ricky McGraw were committing misconduct. *Id.* at 100:15-18, 23-25.

65. Furthermore, Steptoe testified that he never participated in any fraud investigation involving SFR. *Id.* at 8:6-8. He had no knowledge of any alleged fraudulent conduct by SFR, and thus, he never had any communications with his supervisors about his topic. *Id.* at 13:17-20. With

---

[4] Regarding the Irma claims at issue, waiving a client's deductible or giving a client a discount up to their deductible based on the number of referrals, was not illegal. Depo of Ian Brown, **Exhibit 9**, at 7:17-20; 92:8-10, 12-15, 18-20.

respect to the many SFR estimates he reviewed in connection with Hurricane Irma claims, he never made any determinations that the estimates were fraudulent in any way. *Id.* at 42:8-12.

66. Using a subcontractor for a roofing job is not improper. *Id.* at 87:7-10. It is self-evident that a general contractor would charge more than its hired subcontractor; otherwise, a general contractor would never make a profit. *See id.* at 90:23-25 – 91:1-2.

67. Critically, Steptoe also testified no one at his company ever told him SFR's estimates were fraudulent. *Id.* at 101:1-3. Steptoe was never coerced into resolving a claim. *Id.* at 103:11-14. In this connection, he would not rely on any documents submitted by a contractor that he believed were fraudulent. *Id.* at 104:11-18.

**Jonathan Graves**

68. Jonathan Graves testified as the corporate representative of Bluegrass Insurance Management, LLC ("Bluegrass"), an insurance adjusting entity with the same majority owners as THIG and the Insurance Companies. *See* Depo. of Jonathan Graves, **Exhibit 11**, at 77:24-25 – 78:1-3. He is the director of the field adjusters. Graves Depo., at 19:22-24. If a desk or field adjuster ever believed a claim involved fraud, it would be in the claims notes narrative. *Id.* at 50:1-16, 18-21; 86:16-18, 20-22. With respect to an estimate of the price and scope of a loss, the estimate can be too high or too low, and the parties can often disagree on the costs. *Id.* at 156:5-8, 10-14; 158:9-22; 160:9-25 – 161:1. Disagreements on the price and scope of a loss is not evidence of fraud. *Id.* Bluegrass never adjusted SFR claims any differently than other hurricane insurance claims. *Id.* at 46:16-19; 77:14-17.

69. Significantly, Bluegrass uses batches provided by Tower Hill as part of its estimating process, which allows the estimator to use pre-set line items or categories that describe the work to be completed and the cost. *Id.* at 142:24-25 – 143:1-11. Batches assist the estimator in

streamlining the process and making it more automatic. *Id.* at 144:21-25 – 145:1-12. Prior to being deposed, Graves had no knowledge of the facts that allegedly formed the basis of Tower Hill's allegations. *Id.* at 46:20-25 – 47:1-4, 19-21. For years after Tower Hill filed its RICO Lawsuit, it never provided Bluegrass with any directives on the handling of SFR claims, and Bluegrass had no knowledge about the alleged wrongdoing of any of the SFR-related parties. *Id.* at 47:22-25 – 48:1-25 – 49:1-8, 16-18, 20, 22-24.

**Shaunte Talbert**

70. Shaunte Talbert is an employee that works for Bluegrass, an independent adjusting firm that is affiliated with Tower Hill as discussed above. Depo. of Talbert, **Exhibit 12**, at 43:13-15; 96:11-12. She adjusted claims for each of the Plaintiffs in this case. *Id.* at 18:20-25 – 19:1-9. When she adjusts claims, Tower Hill's quality control department at times provides comparative estimates for the work to be completed, but Talbert testified that Tower Hill continues to evaluate the merits of the claim independently. *Id.* at 27:8-25 – 28:1-4; 76:8-25 – 78:1-18. She does not blanketly rely on the quality control department's findings. *Id.*

71. Furthermore, Talbert did not handle SFR claims differently from other contractors' claims and the amounts subcontractors are paid are so irrelevant to her analyses that she did not request this information. *Id.* at 64:20-25; 131:14-25 – 132:8. Critically, neither SFR nor Elite Claims ever coerced her into resolving a claim and she never overpaid on an SFR claim due to SFR indicating a lawsuit would be filed in the future. *Id.* at 62:23-25 – 63:1-6, 7-25; 64:1-3, 5; 129:1-3. When there was a disagreement concerning an SFR estimate, SFR simply told her the matter would need to be referred to SFR's legal team to further handle the matter. *Id.* More importantly, Talbert never principally relied on SFR's estimate when determining whether a claim

was covered or the amount to pay. *Id.* at 67:4-12; 128:20-25. She would commission engineers and field adjusters for these purposes and evaluate the claim on its own merits. *Id.* at 129:4-17.

72. Regarding the amount to pay to bring a property back to its pre-loss condition after hurricane damage, Talbert never considered how much SFR paid its subcontractors to complete the job. *Id.* at 131:14-25; 132:1-8. This was an irrelevant factor because Tower Hill performed its own evaluation regarding the amount of the damages that were related to hurricane loss. *Id.* Even if SFR's estimates were inflated, Tower Hill did not pay or overpay a claim relying on SFR's documents because the carrier must perform its own independent evaluation regarding the price, scope, and cause of the loss. *Id.* at 70:14-25 – 71:1-6, 8-16; 141:24-25 – 142:1-10.

73. Similarly, Tower Hill would not rely on any documents submitted by a contractor regarding an insurance claim that the carrier believed to be fraudulent, false, or misleading. *Id.* at 71:19-25 – 72:1-4, 7-18; 74:16-22. Talbert emphasized that Tower Hill would only pay a claim after the claim investigation concluded. *Id.*

**Tim Ferguson**

74. Tim Ferguson, the director of claims in litigation for Tower Hill, testified that he has not seen any reports prepared by Tower Hill regarding Ricky McGraw, Matt McGraw, Elite Claims, or McGraw Property Solutions. Depo. of Tim Ferguson, **Exhibit 13**, at 10:21-22; 83:12-21; 84:7-10. He never reviewed an estimate written by Ricky McGraw, Matt McGraw, McGraw Property Solutions, or Will Mynatt either. *Id.* at 90:24-25 – 91:1-18.

75. At no point in time, including after the filing of the RICO lawsuit, did Tower Hill personnel ever instruct the desk adjusters to handle an SFR claim differently than any other hurricane claim. *Id.* at 73:8-18; 73:19-25 – 74:1; 85:19-22, 24-25 – 86:1-7; 97:22-25 – 98:1-3, 7-14. Each claim was evaluated on its own merits. *Id.* In fact, other than stating none of the carrier-

plaintiffs had any employees, Ferguson had no knowledge regarding the facts of the RICO Lawsuit at all. *Id.* at 76:10-25 – 77:1-14; 89:20-25 – 90:1-14.

76. Critically, as the director of claims in litigation, he had no knowledge of any facts implicating SFR in any fraud scheme. *Id.* at 81:7-8, 11-17. Ferguson also testified that Tower Hill did not impose any rule, policy, or requirement concerning the reasonable price per square for a roof replacement. *Id.* at 111:7-19. And, whether a homeowner actually decided to repair or replace a roof after receiving the actual cash value (ACV) of a covered loss is irrelevant. *Id.* at 113:4-20. A homeowner is free to use ACV proceeds as he or she sees fit. *Id.*

77. Ferguson also testified about the resolution of claims. *Id.* at 107:13-24. Even if Tower Hill believes an estimate is inflated, the carrier always has the ability to investigate the price and scope of the claim on its own. *Id.* at 101:10-25 – 102:1. This would naturally include the ability to obtain multiple estimates. *Id.* If the carrier believes an estimate is too high, Tower Hill would not rely on the estimate when determining the amount to pay. *Id.* at 100:6-19. When a claim is compromised through a settlement, both parties may not be happy about the result per se, but the parties achieved the goal of a resolution. *Id.* at 107:13-24.

**<u>Andrew King</u>**

78. Andrew King, an independent adjuster for Tower Hill, also testified in this case. Depo. of Andrew King, **<u>Exhibit 14</u>**, at 10:10-25 – 11:1-15. He settled insurance claims with SFR concerning the carrier-plaintiffs that filed the 2020 RICO Lawsuit (pre-severance). *Id.* at 11:9-15; 30:16-22. No one on behalf of Tower Hill ever told him the Defendants were engaged in any type of fraudulent scheme. *Id.* at 30:16-22. King always considered the merits of the claim and, if possible, he resolved the claim after concluding his investigation. *Id.* at 31:23-25; 103:6-15.

79. When resolving a claim through a release agreement, all of the information relevant to the settlement of the claim would be in the adjuster's claim notes. *Id.* at 67:22-25; 68:13-19. SFR's claims were not segregated or isolated for further review because Tower Hill's directive is to evaluate each claim independently. *Id.* at 46:8-24.

80. Even though King testified that estimates submitted by SFR and Elite Claims were often high in his opinion, King never received any documents from SFR or Elite Claims that he believed were fraudulent, false, or misleading. *Id.* at 125:22-25 – 126:24. No one on behalf of Tower Hill ever told him to handle an SFR claim differently than another other hurricane claim. *Id.* at 46:25 – 47:1-5; 49:24-25 – 50:1-6; 171:4-8. Any instructions given regarding how to handle a hurricane claim applied to all contractors uniformly. *Id.* at 25:18-25 – 26:4.

81. Furthermore, King testified that when he resolved SFR claims, including after the Plaintiffs filed the 2020 RICO Lawsuit, he personally had no knowledge of the alleged facts. *See id.* at 72:7-14, 16-25. No one on behalf of Tower Hill ever informed him about any alleged fraudulent conduct. *Id.* at 74:3-11. King acknowledged that Tower Hill personnel would not necessarily inform the adjusters about such conduct because they were directed to just resolve the claims based on the merits. *Id.* at 72:7-14, 16-25; 85:16-21; 86:8-15.

82. In fact, King stated that all of the SFR claims he resolved were resolved consensually and he was not tricked or duped by SFR into resolving the matters. 83:20-25 – 84:13. Tower Hill approved the resolution of the claims King handled. *Id.* at 87:4-8.

**Cheryl Stanley**

83. Cheryl Stanley was a desk adjuster for Tower Hill during the time period at issue here. Depo. of Stanley, Vol. 1, **Exhibit 15**, at 35:2-16. Stanley also testified that when adjusting a

claim, she would not rely on a document she believed to be fraudulent, false, or misleading. *Id.* at Vol. 2, 249:2-19.

**Kelsey Ugarte**

84. Kelsey Ugarte is a claim specialist for Tower Hill, and part of her responsibilities are to adjust claims and resolve them. Depo. of Ugarte, **Exhibit 16**, at 12:1-10. She regularly adjusted claims for all of the carrier Plaintiffs here. *Id.* at 13:13-24. All claims are handled independently based on the merits of the matter. *Id.* at 13:25 – 14:1-3. Ugarte testified if she handled a claim that resolved with a payment, it was a valid claim. *Id.* at 14:20-24. Aside from knowing who Ricky McGraw is and what SFR and Elite Claims does, she did not have any direct experience with any of the Defendants in this case. *Id.* at 15:1-22.

85. However, when SFR submitted estimates to Tower Hill, Ugarte testified that the estimates were always higher than the estimates obtained by Tower Hill in terms of the damages at issue. *Id.* at 16:5-6. Critically, she testified that Tower Hill would not pay a claim it believed was fraudulent, and no one at Tower Hill ever advised her that it believed SFR submitted fraudulent estimates or that any of the Defendants were engaging in criminal activity. *Id.* 17:8-15; 29:4-21.

86. Even if Tower Hill believed an SFR estimate was inflated, it resolved the claim based on what Tower Hill concluded was a reasonable price. *Id.* at 19:10-15; 34:21-24. She was not involved in any Tower Hill investigation regarding SFR and insurance fraud. *Id.* at 24:23-25. Whether SFR used subcontractors to perform the work was irrelevant to the due diligence performed by Ugarte when she resolved an SFR claim. *Id.* at 26:3-7; 33:21-25.

87. Additionally, Ugarte was not forced or threatened in any manner to resolve an SFR claim. *Id.* at 26:12-21; 32:23-25 – 33:1-6. SFR's estimate would never be the sole basis on which Tower Hill would pay a claim – comparative estimates and field adjuster reports were used to

gauge the amount of the claim. *Id.* at 26:22-25 – 27:1-9, 12; 32:16-21; 35:1-25 – 36:1-7. Furthermore, SFR claims were not resolved any differently than other insurance claims, even after the carrier-Plaintiffs filed 2020 RICO Lawsuit. *Id.* at 27:24-25 – 28:1-9; 36:13-23.

88. If Tower Hill and SFR could not resolve a claim, a lawsuit would likely get filed. *Id.* at 30:5-13. Yet, the filing of a lawsuit after a disagreement was a routine practice she experienced with other non-SFR contractors. *Id.* at 30:19-24. Litigation was not abnormal in this context and Tower Hill never authorized the overpayment on any claim Ugarte handled. *Id.* at 31:1-8. In fact, when a claim was resolved by Tower Hill, it was done voluntarily. *Id.* at 32:10-15. Lastly, there was never any discussion within Tower Hill regarding the most it would pay for a roof replacement on a price per square basis. *Id.* at 37:1-4.

**Steve Gordon**

89. Steve Gordon also testified in this case. He was an independent field adjuster for Tower Hill and wrote roof estimates for all of the carrier Plaintiffs that field the 2020 RICO Lawsuit. Depo. of Gordon, **Exhibit 17**, at 12:11-13; 15:13-20; 16:1-19; 18:18-22; 19:4-19; 21:2-9. All claims are adjusted and resolved based on their own merit. *Id.* at 15:6-8, 11. He could not recall any instances where Tower Hill's SIU was involved on an SFR claim he handled. *Id.* at 19:20-25 – 20:1-8.

90. SFR claims were not handled any differently than claims involving other contractors. *Id.* at 22:4-8. When he wrote estimates involving roof replacements, the line items and the prices were preset by Tower Hill. *Id.* at 29:1-8. With regard to the roof estimate he prepared for one of the claims at issue here, he believed a price of over $1,500 per square was reasonable. *Id.* at 40:19-21; 41:15-17.

**Jacob Jimenez**

91. Jacob Jimenez, an independent adjuster for Tower Hill during the time period at issue, testified in this case too. Depo. of Jimenez, **Exhibit 18**, at 13:3-14; 83:23-25 – 84:1. He worked for Integrity Adjusters and adjusted claims regarding SFR for all of the Insurance Companies that filed the 2020 RICO Lawsuit. *Id.* at 14:7-25 – 15:1-4. He resolved all claims on their own merit. *Id.* at 18:6-9. Jimenez would not recommend to his supervisor to resolve a claim that involved fraud. *Id.* at 24:9-12. Tower Hill and Integrity Adjusters believed that SFR's estimates were inflated and experienced similar instances with other contractors. *Id.* at 27:1-16; 28:4-16.

92. Yet, SFR claims were not handled any differently than any other contractor claims. *Id.* at 28:17-23. When investigating a claim, Integrity Adjusters would send out a field adjuster to inspect the property and prepare a report. *Id.* at 36:3-10. Once Tower Hill made a coverage decision, a negotiation occurred with the contractor regarding the scope of repairs and then the price. *Id.* at 36:17-25 – 38:1-11.

93. The quality control department would assist with comparative estimates regarding the price. *Id.* at 37:17-21; 38:5-11. During the end of 2018 through 2019, he adjusted numerous SFR claims. *Id.* at 42:21-25 – 43:1-5. He recalled Tower Hill's quality control department performed a lot of comparative estimates on SFR claims due to price discrepancies. *Id.* at 43:9-11. This process at times involved obtaining several comparative estimates. *Id.* at 45:14-21. Based on Jimenez' experience, Tower Hill did not settle SFR claims based solely on SFR's estimate. *Id.* at 48:2-6, 10.

94. Furthermore, he never requested information about SFR's subcontractors because the amounts SFR paid its subcontractors was not pertinent to the price analysis. *Id.* at 56:4-10;

57:7-16. Tower Hill never established a floor price or a ceiling price on a per square basis for roof replacements because these claims were all variable. *Id.* at 57:18-24; 59:10-13; 60:5-10, 13-23.

95. The resolution of claims often involved multiple levels of approval above Jimenez' authority depending on the amount of the claim. *Id.* at 88:1-10. Other than SFR suggesting it may file a lawsuit if the parties could not resolve a claim, he testified SFR did not coerce or threaten Tower Hill to resolve claims. *Id.* at 50:18-25; 52:10-20. The negotiations always occurred within the bounds of the law. *Id.* at 52.

**Claire Hatcher**

96. Claire Hatcher, a claims examiner for Tower Hill, testified in the Heggerick property damage case about SFR's allegedly high estimates and the settlement of claims. Tower Hill dropped the Heggerick claim in the last iteration of the State Court Action. Hatcher testified in 2021 that she believed SFR's estimate for this claim was high, and SFR ultimately agreed to reduce the price. Depo of Claire Hatcher, Heggerick case, **Exhibit 19**, at 60:9-16.

97. Hatcher stated the price per square for a roof replacement is variable and depended on the roofer involved. *Id.* at 61:4-6, 8-10. In her experience, her default price is $1,500 per square, which can be increased for other reasons depending on the circumstances. *Id.* at 64:22-25 – 65:1-2. Furthermore, $1,800 per square is reasonable based on her experience as a claims examiner. *Id.* at 65:12-17. In fact, Hatcher emphasized:

> When there is a large difference in a contractor's estimate and our adjusters estimate we request quality control to do an estimate for us, a verified estimate that the work can be done for. That's on any claim that there is such a vast difference from one price to the other. And so, they do that and we always pay on them -- on their [quality control] estimate we always pay on their estimate, because basically they're sort of experts in estimating.

*Id.* at 27:12-20.

**<u>Ricky McGraw</u>**

98. In a related case, Ricky McGraw testified about his agreement to buy out his former business partner, Koh Knox. This testimony is relevant to the RICO case because Tower Hill asserts that SFR never pays a subcontractor more than $1,200 per square for a roof replacement. Therefore, Tower Hill concludes SFR's estimates in excess of this amount are fraudulent.

99. The problem with Tower Hill's logic is that it has no basis in reality. In fact, Ricky McGraw testified that he does not pay every subcontractor the same. Hearing to Unseal Purchase Agreement, **<u>Exhibit 20</u>**, at 34:22-25. Every job is different. *Id.* at 35:22-25 – 36:1-14. Since roof sizes and the complexity of the job varies, SFR negotiates the rate accordingly. *Id.* The fact that Ricky McGraw negotiated a unique deal with Koh Knox to buy out his former business partner is irrelevant because contractors are not paid the same. *See id.* at 46:1-4; 49:22-4; 50:4-9; 51:11-13; 93:14-21.

**<u>Michael Monteverde, Esq.'s Arguments at a Status Conference in the State Court Action</u>**

100. More importantly, Tower Hill's counsel even conceded the following at a hearing before this Court regarding the estimates at issue:

> So the reason I'm not totally clear on the amount of damages on which claims is because if I'm being completely candid with the Court, which I want to be, right, I have a difficult time saying – and I wouldn't be being honest if I said that on the later claims that were filed, that my client was somehow induced by his fraudulent activity because towards the end of it, my client knew exactly what they were doing.

Hearing Transcript, Jan. 10, 2023, **<u>Exhibit 21</u>**, at 13:16-25.

**C. The Third Part of the Scheme – Using the State Court Action as a Discovery Device to Coordinate with Florida's Department of Financial Services in an Effort to Criminally Prosecute Ricky McGraw.**

101. **The third part of the scheme involved** the Tower Hill Insurance Collective and Zinober perpetuating the State Court Action long enough (under the guise of various amendments, as well as increasing and decreasing the number of insurance claims at issue) as a discovery device to feed information to the Department of Financial Services ("DFS") so that McGraw could be criminally prosecuted. Nemeth spearheaded this effort on behalf of the Tower Hill Insurance Collective, and was relentless in his efforts with Clasen and Prince-Swift, a Detective and Investigator with DFS, respectively. Prince-Swift was particularly "eager" to prosecute McGraw.

102. Remarkably, SFR and McGraw discovered through public records requests to DFS that the Insurance Companies were not only coordinating their efforts with DFS regarding the State Court Action presuit, but they (and Zinober) were exchanging information with DFS relevant to the State Court Action post-suit as well, including material documents that were not produced in the State Court Action.

103. Moreover, Tower Hill's SIU Department (i.e., Nemeth) was the point-person as it related to the exchange of information and meetings between DFS, the Insurance Companies, and Zinober. Indeed, as noted above, the Insurance Companies and Zinober were using the State Court Action as a discovery tool to feed information to DFS in an effort to criminally prosecute McGraw. On at least one occasion, Nemeth and the Tower Hill Insurance Collective requested DFS to "delete" evidence e-mailed to DFS. Below is a brief timeline of events that illustrates these points.

- **December 2, 2019** – Tower Hill's SIU Department is providing information to DFS about potential criminal referrals regarding claims that are now (or once were) included in the State Court Action. A copy of this report is attached hereto as **Exhibit 22**. ***This is before the Insurance Companies filed the State Court Action.***

- **February 14, 2020** – Tower Hill's SIU Department is sharing information with DFS about its forthcoming civil RICO lawsuit against SFR. A copy of this report is attached hereto as **Exhibit 23**. ***This is before the Insurance Companies filed the State Court Action.***

- **June 5, 2020** – Tower Hill's SIU Department provided documents to DFS related to Tower Hill's civil RICO case against SFR. A copy of this report is attached hereto as **Exhibit 24**. ***This is after the Insurance Companies filed the State Court Action***.

- **September 4, 2020** – Carl Nemeth e-mails DFS a copy of the State Court Action and acknowledges the State Court Action is being used as a discovery device to further the objective of the Tower Hill Insurance Collective to pursued the State to prosecute McGraw. A copy of the e-mail as attached hereto as **Exhibit 25**. ***This is after the Insurance Companies filed the State Court Action***.

- **November 10, 2020** – Tower Hill's SIU Department is providing claims information to DFS regarding certain matters it believes demonstrate SFR engaged in fraudulent activities. A copy of this report is attached hereto as **Exhibit 26**. ***This is after the Insurance Companies filed the State Court Action***.

- **November 11, 2020** – Nemeth e-mailed DFS to provide documents the Tower Hill Insurance Collective obtained through discovery in the State Court action in an effort to prosecute McGraw criminally. A copy of this e-mail is attached hereto as **Exhibit 27**. ***This is after the Insurance Companies filed the State Court Action***.

- **December 1, 2020** – Nemeth e-mailed DFS against about documents the Tower Hill Insurance Collective obtained through discovery in the State Court action in an effort to prosecute McGraw criminally. A copy of this e-mail is attached hereto as **Exhibit 28**. ***This is after the Insurance Companies filed the State Court Action***.

- **December 4, 2020** – Tower Hill's SIU Department is sharing information with DFS regarding certain allegedly inflated claims at issue in this case. A copy of this report is attached hereto as **Exhibit 29**. ***This is after the Insurance Companies filed the State Court Action***.

- **January 11, 2021** – A virtual meeting occurred between DFS, Personnel from Tower Hill's SIU Department, SIU Investigator Kyle Abernathy and SIU Director Nemeth, and Zinober to discuss allegedly "inflated claims" submitted to Tower Hill by SFR, and the ***"[n]eed [for] 10-12 claims showing egregious inflation for insurance fraud, RICO, racketeering, and organized schemes to defraud."*** A copy of this report is attached hereto as **Exhibit 30**. ***Critically, this meeting occurred after the Insurance Companies filed the State Court Action***.

- **January 26, 2021** – Nemeth e-mailed DFS, including Clasen, and attached a copy of the State Court Action, presumably in an effort to persuade DFS to refer the matter to the applicable criminal prosecuting authorities. A copy of this e-mail is attached hereto as **Exhibit 31**. ***Critically, this meeting occurred after the Insurance Companies filed the State Court Action***.

- **February 5, 2021** – Tower Hill, its SIU Department, Michael Monteverde (counsel from Zinober) and DFS discuss 233 claims that were allegedly inflated and fraudulent. A copy of this report as attached hereto as **Exhibit 32**. ***Significantly, this occurred after the Insurance Companies filed the State Court Action.***

- **April 29, 2021** – The Insurance Companies are continuing to coordinate their efforts with DFS regarding "the specific fraud actions necessary to support the inflated and egregious costs submitted by SFR." A copy of this report is attached hereto as **Exhibit 33**. At this time, Tower Hill was investigating 233 allegedly "fraudulent" claims and a virtual meeting was scheduled between Tower Hill, Zinober, and DFS. ***This is after the Insurance Companies filed the State Court Action.***

- **May 7, 2021** – Tower Hill's SIU Department, its counsel, and DFS have a virtual meeting to discuss "17 claims that all similarly and closely portrayed SFR's ongoing course of business actions to submit exorbitant invoices/costs to the carrier while using litigation to leverage their position against Tower Hill Insurance." Critically, during this meeting, ***Tower Hill "produced a PowerPoint presentation [to DFS] outlining their findings and concerns with the 17 claims that were identified as 'most egregious and similar of the 250 claims . . . that had been reviewed."*** A copy of this report is attached hereto as **Exhibit 34**. A copy of the PowerPoint Presentation is attached hereto as **Exhibit 35**. Tower Hill's letter to DFS identifying the purportedly "fraudulent" claims is attached hereto as **Exhibit 36**. ***This occurred after the Insurance Companies filed the State Court Action***.

- **May 11, 2021** – Nemeth e-mailed DFS about making a presentation to the State Attorneys' Office about prosecuting McGraw criminally. A copy of this e-mail is attached hereto as **Exhibit 37**. ***This occurred after the Insurance Companies filed the State Court Action***.

- **June 8, 2021** – Nemeth e-mailed DFS, including Clasen regarding working together to build upon the racketeering case against SFR (and McGraw). A copy of this e-mail is attached hereto as **Exhibit 38**. ***This occurred after the Insurance Companies filed the State Court Action***.

- **July 22, 2021** – Nemeth e-mailed DFS about coordinating their efforts to vet and substitute claims that were part of the State Court Action. A copy of this e-mail is attached hereto as **Exhibit 39**. ***This occurred after the Insurance Companies filed the State Court Action***.

- **August 6, 2021** – Tower Hill's SIU Department shared significant information "for the (17) claims" with DFS. A copy of this report is attached as **Exhibit 40**. ***This is after the Insurance Companies filed the State Court Action.***

- **October 7, 2021** – DFS met with the State Attorneys' Office ("SAO") regarding the above mentioned 17 allegedly "fraudulent" claims (significantly less than the purported 250 claims). The SAO concluded there was no evidence of any criminal conduct and that the alleged inflated estimates submitted by SFR simply involved a civil matter between SFR and the Insurance Companies. Critically, the Insurance Companies then sought an audience with the SAO regarding "their complaint" and "had additional information regarding separate claims unrelated to the 17 noted for issues with billing for services not rendered. A copy of this letter and accompanying report is attached hereto as **Exhibit 41**. ***This is after the Insurance Companies filed the State Court Action.***

- **October 12, 2021** – DFS e-mailed Nemeth about a meeting DFS had with the head attorney for Economic Crimes at the State Attorneys' Office regarding whether a criminal case was viable against McGraw. ***At the conclusion of the meeting, the State Attorneys' Office concluded there was a lack of probable cause***. A copy of this e-mail is attached hereto as **Exhibit 42**. ***This is after the Insurance Companies filed the State Court Action.***

- **October 18, 2021** – Dissatisfied with the October 12, 2021 response from DFS and the State Attorneys' Office, Nemeth e-mailed the Assistant State Attorney directly, copying DFS, Monteverde, and other Tower Hill personnel about pursuing SFR/McGraw criminally. A copy of

this e-mail is attached hereto as **Exhibit 43**. ***This is after the Insurance Companies filed the State Court Action.***

- **November 20-December 14, 2021** – Carl Nemeth and DFS exchanged e-mails about coordinating their efforts with Florida's statewide prosecutor regarding SFR and McGraw. A copy of this e-mail is attached hereto as **Exhibit 44**. ***This is after the Insurance Companies field the State Court Action.***

- **November 17, 2022** – Carl Nemeth sent an e-mail to DFS, including Prince-Swift, about leveraging witnesses in the State Court Action for use in a potential criminal case. A copy of this e-mail is attached hereto as **Exhibit 45**. ***This is after the Insurance Companies filed the State Court Action***.

- **August 3, 2023** – Carl Nemeth e-mailed Prince-Swift about interfering with Plaintiffs' banking activities in an effort to thwart their business. Subsequently, Plaintiffs' banking accounts were compromised at JM Morgan Chase. A copy of this e-mail is attached hereto as **Exhibit 46**. ***This is after the Insurance Companies filed the State Court Action***.

104. ***In 2023, a criminal case was filed by the State of Florida against McGraw in Lee County, Florida during the prosecution of the State Court Action*** based on efforts coordinated by Nemeth (on behalf of the Tower Hill Insurance Collective), Clasen, and Prince-Swift. The goal was to destroy Plaintiffs' business through civil and criminal litigation.

105. For example, on **February 20, 2024**, during the pendency of the State Court Action and the criminal case, Nemeth e-mailed Prince-Swift stating he had new SFR files for her to review so they could coordinate their efforts on the civil and criminal case. A copy of this e-mail is attached hereto as **Exhibit 47**.

106. Throughout the pendency of the criminal case, Zinober often injected itself on behalf of the Tower Hill Insurance Collective in various court filings, objecting to McGraw's efforts to request and use documents in their possession in the defense of his case. The Judge in the criminal case made comments during at least one hearing that the practice was most atypical. As such, Zinober was not only involved in the State Court Action as counsel of record for the Insurance Companies, but the law firm, on behalf of the Tower Hill Insurance Collective, also frequently objected to McGraw's discovery efforts in the criminal case.

107. The goal was for the criminal case to remain pending for years thereby ensuring Plaintiffs' business demise due to the ongoing matters on the civil and criminal litigation fronts. For example, the Tower Hill Insurance Collective and Zinober filed at least 10 motions for protective order and/or objections to subpoenas related to discovery served by McGraw to aid in his defense of the criminal case. McGraw's discovery targeted exculpatory evidence that was not in the possession of the State. Yet, the Tower Hill Insurance Collective and Zinober continuously sought to prevent McGraw from discovering the information necessary to his defense.

108. The Tower Hill Insurance Collective, Zinober, Nemeth, Clasen, and Prince-Swift all believed Plaintiffs' business was criminal in nature. Collectively, they persuaded the Office of the State Attorney for Lee County to prosecute McGraw for felony crimes. In total, Ricky McGraw faced decades in prison for crimes he did not commit, that were orchestrated by the Tower Hill Insurance Collective, Zinober, Nemeth, Clasen, and Prince-Swift and others, and were based on false facts.

109. In reality, the factual bases for the felony criminal charges all stemmed from egregiously faulty investigations. These investigations were nothing more than a house of cards waiting to collapse, which ultimately occurred through conflicting deposition testimony and

recanting previously sworn statements. It appeared material witnesses and investigators, including Clasen and Prince-Swift, fabricated facts in investigative reports and in other communications with other parties, and intentionally misled the prosecuting attorney(s) into believing Ricky McGraw committed felony crimes. To be sure, the criminal case should never have been filed.

110. The underlying criminal case discussed above was pending in Lee County, Florida for years. Shortly before trial, Monteverde and Zinober e-mailed the prosecuting attorney in an attempt to explain how they interpreted the evidence against McGraw. A copy of this e-mail sent on **January 22, 2026** is attached hereto as **Exhibit 48**. The purpose of this e-mail was to further the scheme and ensure they kept the prosecution focused on the case. Yet, around 1 week prior to trial, the State of Florida filed a Notice of *Nolle Prosequi* to abandon and dismiss the action. Afterwards, public statements on behalf of DFS and the Office of the State Attorney were made that the case was dismissed due to a lack of evidence.

111. Significantly, the prosecution of McGraw should never have occurred in the first place. In fact, it appears the entire criminal case has been expunged from the Lee County Clerk of Court's records. Due to the pendency of the criminal case for years, the matter caused McGraw emotional distress, loss of substantial income, and other related damages, including the irreparable destruction of McGraw's roofing business, SFR.

**D. The Fourth Part of the Scheme – Systematic Dismissal of the TH Select and Omega Lawsuits.**

112. **The fourth part of the scheme involved** the systematic dismissal of the TH Select and Omega severed cases. After over 6 years of litigation, after the statute of limitations expired, and after Plaintiffs filed their Motions for Summary Judgment, Omega and TH Select dismissed the respective cases.

113. In the end, Plaintiffs' business was destroyed due to a scheme perpetuated by the Tower Hill Insurance Collective, Zinober, Nemeth, Clasen, and Prince-Swift.

**E. <u>Additional Racketeering Allegations</u>**

**<u>The RICO Enterprise – Association-in-Fact Enterprise</u>**

114. Defendants engaged in an enterprise, which affects interstate commerce. As detailed herein, THIG and its affiliates have related operations in Kentucky and Bermuda that aid and assist in the Tower Hill Insurance Collective's business. Moreover, Bluegrass is an adjusting entity operating in Kentucky that is an affiliate of the Tower Hill Insurance Collective, and, upon information and belief, assisted the Tower Hill Insurance Collective in resolving the insurance claims. Thus, the Tower Hil Insurance Collective's business footprint involved interstate and international operations. The resolution of the SFR claims ultimately involve the use of interstate mail and e-mail with regard to the payments made to SFR, whose sole Member is domiciled in Puerto Rico.

115. The Tower Hill Insurance Collective, Zinober, Nemeth, Clasen, and Prince-Swift constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Each of the Defendants participated in the operation or management of the enterprise as explained in great detail above. The association-in-fact enterprise is highly structured, each member has a role to play as described in this Complaint, and they all worked toward the common goal of destroying Plaintiffs' business through a pattern of unlawful sham civil and criminal litigation, which includes racketeering activity. Defendants functioned to operate the association-in-fact enterprise and manage its affairs through a corrupt pattern of fraud.

116. Defendants have associated with one another in the association-in-fact enterprise for the common purpose of destroying Plaintiffs' business through fraudulent conduct prior to and during civil and criminal litigation. Each Defendant played a role and depended on other members to carry out their respective roles in furtherance of the scheme. As part of the scheme: (i) The Tower Hill Insurance Collective and Zinober fraudulently induced SFR and McGraw to resolve hundreds of insurance claims; (ii) the Tower Hill Insurance Collective and Zinober filed the State Court Action and illegally manufactured the damages as an "opportunity" to destroy Plaintiffs' business; (iii) the Tower Hill Insurance Collective, Zinober, Nemeth, Clasen, and Prince Swift used the State Court Action as a discovery device to coordinate with DFS to criminally prosecute McGraw; and (iv) the Tower Hill Insurance Collective and Zinober systematically dismissed the TH Select and Omega lawsuits when the damage was fully accomplished.

117. Defendants shared longstanding relationships. The association-in-fact enterprise was of sufficient longevity, has been in continuous operation for over five years, at least as early as 2018, and threatens to continue into the future. These relationships described above reflect that Defendants have been intertwined for a significant period of time – over 5 years as well.

118. At all relevant times, the association-in-fact enterprise was foreseeably engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c) as detailed above.

119. Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the association-in-fact enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C.§ 1962(c), namely, mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

**Pattern of Racketeering Activity**

120. As set forth in this Complaint, Defendants' long-running scheme constitutes a pattern of racketeering activity. Defendants engaged in multiple instances of mail and/or wire fraud as part of this pattern. Specifically, Defendants, through the RICO enterprise, knowingly and with intent to defraud, engaged in a scheme to deprive Plaintiffs of money by means of fraud, including false or fraudulent pretenses, representations, or omissions, knowing that interstate mails and wires would be used to further the scheme. The Tower Hill Insurance Collective made false and misleading statements in the above settlement/release agreements (as well as in connection with the payment of the insurance claims that did not involve settlement/release agreements). The Tower Hill Insurance Collective and Zinober represented in the agreements and through the payment of the claims, that the matters were fully and finally resolved. The Tower Hill Insurance Collective and Zinober fraudulently induced Plaintiffs into resolving the claims without any knowledge that the Tower Hill Insurance Collective and Zinober would use these resolutions to manufacture their own alleged damages, including treble damages and attorneys' fees, in the subsequent State Court Action.

121. The Tower Hill Insurance Collective and Zinober then used the State Court Action as a long-running discovery device so Nemeth, Clasen, and Prince-Swift could coordinate their efforts to convince, under false pretenses, the State Attorneys' Office to prosecute McGraw for insurance fraud and other crimes. The State Court Action and related criminal proceeding against McGraw destroyed SFR's business, which was Defendant' end game strategy all along. After achieving their intended purpose, TH Select and Omega dismissed their lawsuits, which were previously part of the State Court Action until the Court severed the State Court Action into 5 separate lawsuits.

122. In furtherance of the scheme, the Tower Hill Insurance Collective and Zinober personally and repeatedly transmitted, or caused to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, and also placed, or caused to be placed, matters and things in any post office or authorized depository, or deposited or caused to be deposited, matters or things to be sent or delivered by e-mail, facsimile, or a private or commercial interstate carrier, on voluminous occasions (i.e. the settlement/release agreements and corresponding payments). Each individual use of the mails and the wires caused by the Tower Hill Insurance Collective and Zinober in furtherance of the scheme is a separate RICO predicate. In this complaint, Plaintiffs focus on instances of mail and wire fraud that primarily took place from 2018-2022 in furtherance of the fraud scheme, the damages of which were not realized until 2026 when the Tower Hill Insurance Collective and Zinober dismissed the Omega and TH Select Actions. But the predicate acts that were part of the scheme ostensibly date back to before 2018.

123. Given the scope of the scheme and the nature of modern litigation, Defendants understood the scheme reasonably contemplated and depended on the ubiquitous use of interstate mail and wires, to communicate and conduct business across state lines, with adverse litigants like Plaintiffs, who are domiciled in Puerto Rico, and with the Florida courts. To name just a few examples, these interstate mail and wire communications included, but were not limited to emails, video conferencing, telephone calls, electronic filing of court papers or disclosures over the internet, electronic service of discovery and court filings over the internet on lawyers, and mailings and wires to transmit settlement agreements and payments. Many of the mailings and wirings contained false statements (the settlement/release agreements and payments were examples cited above) while others were sent as part of a regular pattern of conducting business

essential to effectuate the scheme. Part of THIG's operations include using Bluegrass, an adjusting firm with its principal place of business in Lexington, KY, to adjust or assist in adjusting many of the claims at issue here. Plaintiffs are domiciled in Puerto Rico.

124. The settlement and release chart identified above is a non-exhaustive list of known examples of certain payments sent to Plaintiffs using the mail and interstate wires as part of the scheme.

125. The Tower Hill Insurance Collective and Zinober settled and resolved hundreds of cases involving SFR, who sole member is domiciled in Puerto Rico. As part of these cases, THIG, Zinober, and Bluegrass have sent voluminous mails and interstate wires over many years in furtherance of the fraudulent scheme against Plaintiffs. THIG, Zinober, and Bluegrass, are in the exclusive possession or have exclusive knowledge of many mails and interstate wires – such as between THIG, Zinober, and Bluegrass, between or among attorneys in THIG (i.e. in-house counsel) and Zinober, as well between or among other independent adjusters handling SFR claims on behalf of the Tower Hill Insurance Collective that were part of the scheme. Discovery will reveal additional predicate acts.

126. In addition, the above chart and exhibit of voluminous settlement and release agreements is but the tip of the iceberg of the interstate wire and mails related to the fraudulent scheme. The identity of the other participants in most of these emails is in the exclusive knowledge or control of the Defendants. But at least 57 of the 62 claims identified above (92%) were paid by the Insurance Companies where the purpose was to fully and finally resolve any outstanding controversies regarding the insurance claims, and were used to further the scheme implemented by the Tower Hill Insurance Collective and Zinober. With respect to the balance of the 361 insurance claims that the Tower Hill Insurance Collective and Zinober "dropped" from the State Court Action over the

last 6 years, these also undoubtedly involve additional predicate acts and a pattern of racketeering activity based on the same or similar conduct identified above.

127. As part of the scheme involving the State Court Action, (i) the Tower Hill Insurance Collective, Zinober, Nemeth, Clasen, and Prince Swift also used the State Court Action as a discovery device to coordinate with DFS to criminally prosecute McGraw; and (ii) the Tower Hill Insurance Collective and Zinober systematically dismissed the TH Select and Omega lawsuits when the damage was fully accomplished. These additional facets of the scheme encompassed the association-in-fact enterprise as described in great detail above.

128. As set forth herein, the Tower Hill Insurance Collective (operating through THIG since the Insurance Companies did not have any employees or personnel) and Zinober each individually committed two or more racketeering acts in furtherance of the enterprise. In addition to the many individual acts enumerated above, all of the Defendants were aware that the mails and interstate wires were regularly used to further the scheme Zinober was the only law firm for the Tower Hill Insurance Collective involved with the above insurance claims.

129. Each Defendant was also aware that THIG authorized Zinober to settle and/or otherwise resolve virtually all of the 351 insurance claims, and both filed and served, assisted or supervised the filing and serving, and/or was aware that THIG and Zinober were filing and serving, court documents, including notices of settlement, and voluntary dismissals based on the settlements/releases of the above insurance claims. Each Defendant was also aware that the Tower Hill Insurance Collective and Zinober resolved all of the underlying insurance claims only to use those settlements to manufacture their own damages, including treble damages and attorneys' fees in the State Court Action. The dismissal of the TH Select and Omega lawsuits are examples of sham lawsuits that were used as discovery devices while they were pending to prosecute McGraw criminally,

which was one of the final pieces of the scheme that was used to destroy Plaintiffs' business.

130. Not only did the Tower Hill Insurance Collective (i.e., THIG) and Zinober send, assist or supervise the sending of settlement communications via e-mail, as well as the transmission of the settlements via e-mail, but they also sent the settlement payments through interstate mail to SFR. The other Defendants in this action were aware of the conduct of THIG and Zinober. Nemeth, Clasen, and Prince-Swift were instrumental and directed their facets of the scheme, but were otherwise aware of the conduct of THIG and Zinober, especially since it was all part of one scheme and the same enterprise. Additionally, all Zinober attorneys and staff assigned to the particular insurance claims are equally responsible for transmitting or causing the transmission of a mail or wire in furtherance of the scheme.

131. Defendants' racketeering activity was repetitive and related. The racketeering acts were committed for a common purpose: to further the scheme to defraud Plaintiffs and destroy their business. The racketeering acts were aimed at defrauding the same victims (Plaintiffs); were carried out by the same actors (Defendants); achieved the same results (destroyed Plaintiffs' business); and were implemented through the same conduct described above. Although complete and closed-ended for purposes of the 351 insurance claims identified above, the racketeering acts were so ingrained, consistent, and repetitive that they carry the threat of repetition and continued harm in the future against Plaintiffs in the event Plaintiffs perform property damage work for any homeowners that are insured by Tower Hill. Therefore, the pattern is part of a closed-ended scheme. And, the racketeering acts occurred over a substantial period of time and constitute a pattern of activity even if the scheme were not ongoing.

**Defendants' Conduct Goes Well Past Routine Litigation Activity and Is Actionable**

132. The misconduct in this case extends well beyond normal litigation conduct. It is a persistent pattern of fraud, deceit, and other unlawful conduct. Because the fraud was so pervasive and occurred over multiple fronts, the conventional state remedies are insufficient to address the fraud. Congress therefore empowered private litigants to address these schemes in federal court through the federal RICO statute.

133. This case seeks to hold Defendants accountable for their pattern of fraudulent litigation across the civil and criminal forums at the expense of Plaintiffs and their business. For over 6 years, this unlawful conduct caused Plaintiffs to incur significant legal fees and costs defending the State Court Action, particularly the now dismissed TH Select and Omega lawsuits. The deceit and fraud perpetrated by the Tower Hill Insurance Collective and Zinober induced Plaintiffs into settlements and releases that it would not have entered had it known about the scope and pattern of the Defendants' intended scheme. Consequently, Plaintiffs have been directly and proximately harmed by Defendants' scheme.

134. The misconduct, instead, went well beyond routine litigation activity. Even the adjusters deposed in the State Court Action that handled the underlying insurance claims testified the claims were evaluated and resolve in the normal course, consistent with how any non-SFR insurance claims were handled and settled, and without any assertions of fraud.

**F. Plaintiffs Suffered Significant Damages.**

135. Due to the Defendants' Fraudulent Scheme, Plaintiffs incurred significant damages, including the destruction of Plaintiffs' business and the attorneys' fees incurred defending the State Court Action as it pertains to TH Select and Omega – both pre and post-severance.

**COUNT I**
**VIOLATIONS OF THE RACKETEERED INFLUENCED CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(C))**
**(Against The Tower Hill Insurance Collective and Zinober)**

136. The Plaintiffs re-allege and re-incorporate the allegations set forth in Paragraphs 1-135 above as if fully set forth herein.

137. Each Defendant is a "person" under 18 U.S.C. § 1961(3). This is because each Defendant is capable of holding a legal or beneficial interest in property.

138. The Tower Hill Insurance Collective Zinober, Nemeth, Clasen, and Prince-Swift collectively form an association-in-fact enterprise, as each willing and knowingly conducted and participated in the enterprise's affairs through a pattern of racketeering activity that affected interstate commerce.

139. The object of the association-in-fact enterprise was to destroy Plaintiffs' business through a pattern of racketeering activity.

140. Zinober, who was at all relevant times associated with the Tower Hill Insurance Collective, and both, acting in concert, directly conducted and participated in the business and affairs of the enterprise through a pattern of racketeering in violation of 18 U.S.C. § 1962(c).

141. Specifically, the Tower Hill Insurance Collective and Zinober devised and implemented a scheme to defraud Plaintiffs to settle and resolve insurance claims under false pretenses and thereafter use the funds paid to Plaintiffs to manufacture their own damages, including treble damages and attorneys' fees, in the State Court Action.

142. In fact, the Tower Hill Insurance Collective and Zinober, acting in concert, went as far as using the State Court Action as a tool to funnel discovery materials provided by Plaintiffs directly to DFS in an attempt to have McGraw prosecuted, which occurred. Nemeth, Classen, and Prince-Swift directed the latter component of the enterprise, and were aware of the predicate acts

and pattern of racketeering committed by the Tower Hill Insurance Collective and Zinober. Nemeth, Clasen, and Prince-Swift exerted control over their aspect of the enterprise.

143. In furtherance of this scheme, Zinober and the Tower Hill Insurance Collective repeatedly used or caused their agents to use the mails and wires, including but not limited to, the transmission of settlement payments to Plaintiffs.

144. Each of the acts described above constitute a violation of 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud) and is therefore a predicate act of racketeering activity under 18 U.S.C. § 1961(1).

145. These predicate acts are related in that they shared the same or similar purposes, results, participants, victims, methods of commission and were otherwise interrelated by distinguishing characteristics and were not isolated events. Specifically, each predicate act was committed in furtherance of the 4-part deliberate scheme to destroy Plaintiffs' business. The predicate acts were not isolated events, but rather regular and integral steps in furtherance of the enterprise, the participants of which were the Tower Hill Insurance Collective, Zinober, Nemeth, Clasen, and Prince-Swift.

146. Furthermore, the predicate acts were continuous in that they occurred on a regular basis since at least 2018 and infected the State Court Action.

147. Accordingly, the conduct by the Tower Hill Insurance Collective and Zinober in engaging in the criminal acts of mail and wire fraud constitute a pattern of racketeering for purposes of 18 U.S.C. §§ 1961(5) and 1962(c).

148. By reason of the violations of 18 U.S.C. § 1962(c) by the Tower Hill Insurance Collective and Zinober, Plaintiffs were repeatedly injured in their business and property. Specifically, the violations caused the destruction of Plaintiffs' business and the expenditure of over $1.5 Million in attorneys' fees and costs to defend the State Court Action, which also included the defense of the TH Select and Omega lawsuits post-severance.

149. As a direct and proximate result of the violations of 18 U.S.C. § 1962(c) by the Tower Hil Insurance Collective and Zinober, Plaintiffs are entitled to treble damages, attorney fees, costs, and interest.

WHEREFORE, Plaintiffs SFR and McGraw respectfully request that this Court enter a judgment against Defendants Tower Hill Insurance Collective and Zinober, jointly and severally, for damages, including consequential damages, and treble damages, attorneys' fees, costs, and interest, together with such further relief that this Honorable Court may deem just and proper.

**COUNT II**
**VIOLATIONS OF THE RACKETEERED INFLUENCED CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(D)),**
**(Against the Tower Hill Insurance Collective, Zinober, Nemeth, Clasen, and Prince-Swift)**

150. The Plaintiffs re-allege and re-incorporate the allegations set forth in Paragraphs 1-135 above as if fully set forth herein.

151. Beginning in or before 2020, and continuing through the date of the dismissal of the TH Select and Omega, the Tower Hill Insurance Collective, Zinober, Nemeth, Clasen, and Prince-Swift knowingly and unlawfully conspired and agreed with each other to conduct the affairs of the enterprise to destroy Plaintiffs' business as described above through a pattern racketeering activity that involved mail fraud and wire fraud, which includes their unlawful attempt to criminally prosecute McGraw as described in this Complaint.

152. At all relevant times, each conspirator knew of and participated in this scheme through the specific acts conducted on behalf of the enterprise intended to further the objective of destroying Plaintiffs' business. The Tower Hill Insurance Collective Zinober, Nemeth, Clasen, and Prince-Swift devised an implemented a 4-part scheme and operated an enterprise to further their illicit plan.

153. The Tower Hill Insurance Collective and Zinober knew about and agreed to the commission of two or more predicate acts as part of the RICO conspiracy. They conspired to fraudulently induce Plaintiffs into settling the above insurance claims and thereafter use the settlements and resolutions to claw back funds paid to manufacture damages, including treble damages and attorneys' fees, in the form of the State Court Action. Nemeth, Clasen, and Prince-Swift directed their part of the scheme as part of the conduct of the overall enterprise, which was to use the State Court Action as a discovery device to wrongfully prosecute McGraw criminally and destroy Plaintiffs' business.

154. By reason of the violations of 18 U.S.C. § 1962(c) by the Tower Hill Insurance Collective and Zinober Insurance Companies' and Zinober's, Plaintiffs' business and/or property have been injured. Specifically, Plaintiffs' business has been destroyed and Plaintiffs incurred over $1.5 Million in attorneys' fees and costs defending the State Court Action, including defending the TH Select and Omega actions post-severance.

155. Due to the violations of 18 U.S.C. § 1962(d) by the Tower Hill Insurance Collective, Zinober, Nemeth, Clasen, and Prince-Swift, Plaintiffs are entitled to treble damages, attorney fees, costs, and interest.

WHEREFORE, Plaintiffs SFR and McGraw respectfully request that this Court enter a judgment against Defendants Tower Hill Insurance Collective, Zinober, Nemeth, Clasen, and Prince-Swift, jointly and severally, for damages, including consequential and treble damages, attorneys' fees, costs, and interest, together with such other relief that this Honorable Court may deem just and proper.

**COUNT III**
**VIOLATIONS OF FLORIDA'S CIVIL RICO ACT**
**CHAPTER 772 – FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES**
**(Against The Tower Hill Insurance Collective and Zinober)**

156. The Plaintiffs re-allege and re-incorporate the allegations set forth in Paragraphs 1-135 above as if fully set forth herein.

157. The Tower Hill Insurance Collective Zinober, Nemeth, Clasen, and Prince-Swift collectively form an association-in-fact enterprise, as each willing and knowingly conducted and participated in the enterprise's affairs through a pattern of criminal activity.

158. The object of the association-in-fact enterprise was to destroy Plaintiffs' business through a pattern of criminal activity.

159. Zinober, who was at all relevant times associated with the Tower Hill Insurance Collective, and both, acting in concert, directly conducted and participated in the business and affairs of the enterprise.

160. Specifically, the Tower Hill Insurance Collective and Zinober devised and implemented a scheme to defraud Plaintiffs to settle and resolve insurance claims under false pretenses and thereafter use the funds paid to Plaintiffs to manufacture their own damages, including treble damages and attorneys' fees, in the form of the State Court Action.

161. Each of the settlements and claim resolutions identified above constitute a separate and distinct violation of Section 817.034 of the Florida Statutes.

162. The foregoing conduct makes up multiple instances of unlawful criminal acts in violation of Chapters 895 and 772 of the Florida Statutes, and constitutes a pattern of criminal activity.

163. In fact, the Tower Hill Insurance Collective and Zinober, acting in concert, went as far as using the State Court Action as a tool to funnel discovery materials provided by Plaintiffs directly to DFS in an attempt to have McGraw prosecuted, which occurred. Nemeth, Classen, and Prince-Swift directed the latter component of the enterprise, and were aware of the predicate acts and pattern of criminal activity committed by the Tower Hill Insurance Collective and Zinober. Nemeth, Clasen, and Prince-Swift exerted control over their aspect of the enterprise.

164. In furtherance of this scheme, Zinober and the Tower Hill Insurance Collective Insurance Companies repeatedly used or caused their agents to use the mails and wires, including but not limited to, the transmission of the settlement agreements and payments to Plaintiffs.

165. These predicate acts are related in that they shared the same or similar purposes, results, participants, victims, methods of commission, and were otherwise interrelated by distinguishing characteristics and were not isolated events. Specifically, each predicate act was committed in furtherance of the 4-part deliberate scheme to destroy Plaintiffs' business. The predicate acts were not isolated events, but rather regular and integral steps in furtherance of the enterprise, the participants of which were the Tower Hill Insurance Collective, Zinober, Nemeth, Clasen, and Prince-Swift.

166. Furthermore, the predicate acts were continuous in that they occurred on a regular basis since at least 2018 and infected the State Court Action.

167. Accordingly, the conduct by the Tower Hill Insurance Collective and Zinober in engaging in the criminal acts of mail and wire fraud constitute a pattern of criminal activity for purposes of Sections 772.102 and 772.103 of the Florida Statutes.

168. By reason of the violations by the Tower Hill Insurance Collective and Zinober, Plaintiffs were repeatedly injured in their business and property. Specifically, the violations caused the destruction of Plaintiffs' business and the expenditure of over $1.5 Million in attorneys' fees and costs to defend the State Court Action, which also included the defense of the TH Select and Omega lawsuits post-severance.

169. As a direct and proximate result of the violations Sections 772.102 and 772.103 by the Tower Hil Insurance Collective and Zinober, Plaintiffs are entitled to treble damages, attorney fees, costs, and interest.

170. Section 772.104 provides Plaintiffs the right to pursue a private cause of action for money damages due to the foregoing criminal violations of Section 817.034 of the Florida Statutes.

WHEREFORE, Plaintiffs SFR and McGraw respectfully request that this Court enter a judgment against Defendants Tower Hill Insurance Collective and Zinober, jointly and severally, for damages, including consequential damages and treble damages, attorneys' fees, costs, and interest, together with such further relief that this Honorable Court may deem just and proper.

## COUNT IV
## CONSPIRACY TO VIOLATE FLORIDA'S CIVIL RICO ACT
## CHAPTER 772 – CIVIL REMEDIES FOR CRIMINAL ACTS
**(Against the Tower Hill Insurance Collective, Zinober, Nemeth, Clasen, and Prince-Swift)**

171. The Plaintiffs re-allege and re-incorporate the allegations set forth in Paragraphs 1-135 above as if fully set forth herein.

172. Beginning in or before 2020, and continuing through the date of the dismissal of the TH Select and Omega, the Tower Hill Insurance Collective, Zinober, Nemeth, Clasen, and Prince-Swift knowingly and unlawfully conspired and agreed with each other to conduct the affairs of the enterprise to destroy Plaintiffs' business as described above through a pattern racketeering activity that involved mail fraud and wire fraud, which includes their wrongful attempt to criminally prosecute McGraw as described herein.

173. At all relevant times, each conspirator knew of and participated in this scheme through the specific acts conducted on behalf of the enterprise intended to further the objective of destroying Plaintiffs' business. The Tower Hill Insurance Collective Zinober, Nemeth, Clasen, and Prince-Swift devised an implemented a 4-part scheme and operated an enterprise to further their illicit plan.

174. The Tower Hill Insurance Collective and Zinober knew about and agreed to the commission of two or more predicate acts as part of the RICO conspiracy. They conspired to fraudulently induce Plaintiffs into settling the above insurance claims and thereafter use the settlements and resolutions to claw back funds paid to manufacture damages, including treble damages and attorneys' fees, in the form of the State Court Action. Nemeth, Clasen, and Prince-Swift directed their part of the scheme as part of the conduct of the overall enterprise, which was to use the State Court Action as a discovery device to criminally prosecute McGraw and destroy Plaintiffs' business.

175. By reason of the violations of Sections 772.102 and 772.103 of the Florida Statutes by the Tower Hill Insurance Collective and Zinober Plaintiffs' business and/or property have been injured. Specifically, Plaintiffs' business has been destroyed and Plaintiffs incurred over $1.5

Million in attorneys' fees and costs defending the State Court Action, including the TH Select and Omega actions post-severance.

176. The foregoing was a conspiracy to commit a pattern of criminal activity in violation of Section 817.034, and, as a result, Section 772.103.

177. Due to the violation Sections 772.102 and 772.103 by the Tower Hill Insurance Collective, Zinober, Nemeth, Clasen, and Prince-Swift, Plaintiffs are entitled to treble damages, attorney fees, costs, and interest.

WHEREFORE, Plaintiffs SFR and McGraw respectfully request that this Court enter a judgment against Defendants Tower Hill Insurance Collective, Zinober, Nemeth, Clasen, and Prince-Swift, jointly and severally, for damages, including consequential and treble damages, attorneys' fees, costs, and interest, together with such other relief that this Honorable Court may deem just and proper.

**COUNT V**
**<u>FRAUD IN THE INDUCEMENT</u>**
**(Against the Tower Hill Insurance Collective and Zinober)**

157. The Plaintiffs re-allege and re-incorporate the allegations set forth in Paragraphs 1-100, 112-113, and 132-135 above as if fully set forth herein.

158. This is an action against the Tower Hill Insurance Collective and Zinober for fraud in the inducement.

159. From at least 2018-2022, the Tower Hill Insurance Collective (through THIG) and Zinober, acting in concert, represented to each of the Plaintiffs via e-mail and through the transmission of the settlement/release agreements, as well as through e-mail and other written correspondence regarding insurance claims that were paid without the execution of release agreements, that the insurance claims were fully and finally resolved.

160. These prior material representations were not expressly contradicted by any written agreement between Plaintiffs, the Tower Hill Insurance Collective, and Zinober. At the time Tower Hill Insurance Collective (through THIG) and Zinober, acting in concert made these false representations of then present facts to Plaintiffs (the truth of which the Plaintiffs reasonably believed and relied upon at the time), the Tower Hill Insurance Collective and Zinober, acting in concert, each knew they were false.

161. The Tower Hill Insurance Collective and Zinober, acting in concert, each made these representations with the intent that they would induce Plaintiffs to rely on them and for the Plaintiffs to settle and compromise the insurance claims discussed above.

162. Had Plaintiffs known the representations were false, Plaintiffs would not have settled and compromised the claims without the execution of mutual releases.

163. Plaintiffs justifiably and reasonably relied on the representations made by the Tower Hill Insurance Collective and Zinober, acting in concert, which led to Plaintiffs suffering damages.

164. As a direct and proximate result of the misconduct committed by the Tower Hill Insurance Collective and Zinober, acting in concert, Plaintiffs have been damaged. These damages include the destruction of Plaintiffs' business and over $1.5 Million in attorneys' fees and costs Plaintiffs incurred to defend the State Court Action, including the TH Select and Omega actions post-severance.

WHEREFORE, Plaintiffs SFR and McGraw respectfully request that this Court enter a judgment against Defendants Tower Hill Insurance Collective and Zinober, jointly and severally, for the above compensatory and consequential damages, punitive damages, pre-judgment interest, costs, and all other relief that the Court deems just and proper.

**COUNT VI – MALICIOUS PROSECUTION**
**(Against the Tower Hill Insurance Collective and Zinober)**

165. Plaintiffs reallege the allegations contained in Paragraphs 1-135 above as if set forth fully herein.

166. This is an action against the Tower Hill Insurance Collective and Zinober for malicious prosecution.

167. The Tower Hill Insurance Collective and Zinober filed the State Court Action. They regularly represented the Tower Hill Insurance Collective and regularly represent other insurers defending property damage insurance claims filed by property owners and their assignees.

168. The Tower Hill Insurance Collective and Zinober commenced the State Court Action against SFR and McGraw, and continued the prosecution of the lawsuit for over 6 years as it pertained to TH Select and Omega. As a result, The Tower Hill Insurance Collective and Zinober were the legal cause of the action against SFR and McGraw, who were the Defendants in the TH Select and Omega cases.

169. The Tower Hill Insurance Collective and Zinober voluntarily dismissed the State Court Action pertaining to the severed TH Select and Omega cases. This occurred after SFR and McGraw filed Motions for Summary Judgment in the TH Select and Omega matters. Additionally, by virtue of the expiration of the statute of limitations in the State Court Action, the dismissals constituted a bone-fide termination of the State Court Action pertaining to TH Select and Omega in favor of SFR and McGraw – both pre and post-severance.

170. The Tower Hill Insurance Collective and Zinober lacked probable cause in filing and continuing to prosecute the State Court Action as it pertained to TH Select and Omega, both pre and post-severance. Critically, the lawsuits had no reasonable prospect of success.

171. In fact, at all stages of the proceedings, probable cause did not exist to maintain the State Court Action concerning TH Select and Omega because the causes of action, and the facts purportedly alleged, were false.

172. Further investigation was necessary before the Tower Hill Insurance Collective and Zinober filed the State Court Action. The Tower Hill Insurance Collective and Zinober initiated the lawsuit based on facts that could equally be explained innocently.

173. The Tower Hill Insurance Collective and Zinober commenced and continued the prosecution of the State Court Action pertaining to TH Select and Omega (both pre and post-severance) even though a reasonable lawyer would not regard the lawsuit as tenable and/or the Tower Hill Insurance Collective and Zinober unreasonably neglected to investigate the facts and the law before filing and attempting to litigate the State Court Action regarding TH Select and Omega – both pre and post severance. Thus, the Tower Hill Insurance Collective and Zinober did not file the lawsuit and continue the prosecution of the case in good faith and for a legally justifiable reason.

174. As set forth in great detail above, the Tower Hill Insurance Collective and Zinober filed the State Court Action for improper purposes and without substantial justification.

175. The Tower Hill Insurance Collective and Zinober commenced and continued the State Court Action pertained to TH Select and Omega with actual and legal malice.

176. SFR and McGraw have been damaged as a direct and proximate result of the Tower Hill Insurance Collective and Zinober malicious filing and prosecution of the State Court Action pertaining to TH Select and Omega (pre and post-severance). The Tower Hill Insurance Collective and Zinober destroyed Plaintiffs' business and Plaintiffs incurred over $1.5 Million in attorneys'

fees and costs defending the State Court Action, including the TH Select and Omega actions post-severance.

WHEREFORE, Plaintiffs SFR and McGraw respectfully request that this Court enter a judgment against Defendants Tower Hill Insurance Collective and Zinober, jointly and severally, for the above compensatory and consequential damages, punitive damages, prejudgment interest, costs, and such other and further relief that this Honorable Court may deem just and proper.

**COUNT VII – ABUSE OF PROCESS**
**(Against the Tower Hill Insurance Collective, Zinober, Nemeth, Clasen, and Prince-Swift)**

177. Plaintiffs reallege Paragraphs 1-135, above as if set forth fully herein.

178. This is an action against the Tower Hill Insurance Collective, Zinober, Nemeth, Clasen, and Prince-Swift for abuse of process.

179. Defendants engaged in a scheme of misconduct to destroy Plaintiffs' business through a pattern of fraud, coercion, shifting narratives, and suppression of evidence. Defendants all had specific roles in the scheme, which were well-coordinated, well-developed, and comprised a long-running strategy to destroy Plaintiffs' business by any all means at their disposal. By fraudulently inducing SFR to resolve hundreds of Hurricane Irma insurance claims, the Tower Hill Insurance Collective and Zinober manufactured Tower Hill's damages so they could thereafter sue Plaintiffs to claw back the settlement proceeds and then try to profit from the endeavor by claiming treble damages and attorneys' fees.

180. To be sure, the Tower Hill Insurance Collective and Zinober filed the lawsuit, sent court filings and correspondence to and from this District, directed and conducted discovery over state lines, and engaged in communications by e-mail and telephone to further the scheme, which included the negotiation and payment of the settlements regarding the underlying insurance claims. Next, the Tower Hill Insurance Collective and Zinober perpetrated the litigation for over 6 years

by repeatedly and continuously increasing and decreasing the number of insurance claims, as well as adding and dismissing parties and claims haphazardly.

181. SFR, McGraw, Jessica McGraw (McGraw's wife), McGraw Asset Management, LLC (a real estate entity that never had any connection to insurance claims), Matt McGraw (McGraw's brother), McGraw Property Solutions, LLC (an entity that never wrote estimates and was generally not involved with the insurance claims), Elite Claims Consultants, LLC (Matt McGraw's public adjusting entity), and Will Mynatt (a former SFR salesman) were all named as Defendants at various times through the many iterations of the lawsuit.

182. Eventually, the civil lawsuit filed by the Tower Hill Insurance Collective and Zinober was severed into 5 separate cases with many of the parties being dropped from the actions. At all times, the lawsuit was used as a discovery device to coordinate efforts with the Department of Financial Services so that McGraw could be criminally prosecuted. This piece of the scheme was organized and conducted by Nemeth, Clasen and Prince-Swift, with the participation of the Tower Hill Insurance Collective and Zinober.

183. These individuals constantly and rather obsessively relayed information to the prosecuting authorities even though they gave contradictory testimony throughout the proceedings and several witnesses recanted their testimony.

184. Around August 2025, the State Attorneys' Office e-mailed McGraw's counsel in the criminal case to communicate the State's plea offer, which is summarized below:

**Ricky Lynn McGraw 23-000937CF -- Plea Offer**
3 messages

**Humphreville, John E.** <jhumphreville@sao20.org> Mon, Aug 11, 2025 at 8:56 AM
To: Mike Giasi <mgiasi@giasilaw.com>
Cc: "Horowitz, Jessica I." <jhorowitz@sao20.org>

Good morning,

Please see the below Plea Offer for your client. Also, see the attached special terms and conditions Order. I am willing to discuss reasonable counters with restitution upfront. Please let me know if you have any questions.

Amend Ct1 to a Fraudulent Insurance Claim

Adjudication, 60 months' probation department of corrections, followed by 180 months state probation, anti-theft course, 413 court cost, cost of prosecution tbd, 4,340.04 cost of investigation, restitution tbd, cop, dna sample to fdle dna database.

o Prohibited from applying for or holding a contractor's license or working as or for a contractor or under a "qualifying agent," as the term is defined under Florida law;

o Prohibited from holding, or applying for, any licensing from the Department of Business & Professional Responsibility, including, but not limited to, any contractor's license, a mortgage broker, loan officer, community association manager (CAM), real estate broker, agent or associate;

o Prohibited from applying for or accepting appointment as an officer, manager, or member or any entity licensed by the State of Florida Department of Corporations and any other state;

o Prohibited from entering into any contract or agreement or the like to perform business or construction services, unless specifically approved by the department of probation;

o Prohibited from being a signor on any other's bank accounts, credit card accounts or financial accounts;

o Prohibited from direct access to another's funds;

o Prohibited from using or possessing another's Debit or Credit cards and accounts;

o Prohibited from having signature authority on any bank accounts, except his own personal account.

o Prohibition from possessing or utilizing another's bank account, credit account, debit account, credit or debit card or any other form of payment, belonging to another.

o Prohibited from working in fiduciary or financial capacity;

o Prohibited from working in any manner in the financial, banking, or loan industry.

o Prohibited from working as a bookkeeper or clerk, accounts manager or related field.

185. Previously, the State's plea offer only included probation. Upon information and belief, the above plea offer sent by the State was communicated after Zinober, on behalf of the

Tower Hill Insurance Collective, represented that both could persuade the State to dismiss the criminal case in exchange for Plaintiffs settling the State Court Action in favor of the Tower Hill Insurance Collective. Upon information and belief, Zinober and the Tower Hill Insurance Collective were coordinating their efforts with the State Attorneys' Office. Thus, Zinober and the Tower Hill Insurance Collective used and abused the State Court Action to leverage McGraw and the criminal case – either go to jail and be bound by the above egregious restrictions or resolve the State Court Action for millions of dollars.

186. After McGraw's criminal prosecution lasted over 2 years and destroyed Plaintiffs' business, the State dismissed the criminal case 1 week prior to trial citing a lack of evidence. And now, in 2026, after Defendants achieved their goal through illicit means, the Tower Hill Insurance Collective elected to dismiss the TH Select and Omega actions after over 6 years of litigation and after Plaintiffs spent a fortune in attorneys' fees. All of Defendants' conduct goes well past routine litigation activities; it is fraud and Defendant should be held liable.

187. As a result, Defendants sought to obtain an improper and unlawful collateral advantage over SFR and McGraw. The filing and continued prosecution of the State Court Action as it pertains to Omega and Select (pre and post-severance) served as a bargaining chip for the Defendant – either capitulate and discontinue the business of submitting insurance claims or the civil and criminal litigation would destroy Plaintiffs' business. The lawsuit and the proceedings pertaining to TH Select and Omega also benefited Zinober because, upon information and belief, they received significant attorneys' fees for their efforts and helped the Tower Hill Insurance Collective achieve what the insurance companies could not accomplish without the assistance of a law firm and its lawyers.

188. After the filing and during the continued prosecution of the State Court Action pertained to TH Select and Omega, the Tower Hill Insurance Collective and Zinober, acting in concert, used the lawsuit to further harm Plaintiffs' business.

189. In this connection, and outside the specific context of the State Court Action, the Tower Hill Insurance Collective and Zinober, acting in concert, used the State Court Action as a bargaining chip and as leverage against McGraw. They solicited Plaintiffs to resolve the State Court Action in exchange for THIG and/or TH Prime (the alleged victims in McGraw's criminal case), as well as the Department of Financial Services, declining to be cooperative with the State Attorneys' Office in McGraw's criminal case. Without the cooperation of THIG, TH Prime, and the Department of Financial Services, McGraw's criminal case could not proceed.

190. Using the State Court Action and its proceedings as a club to coerce SFR into a resolution, while also threatening the continuation of McGraw's criminal prosecution, were the means employed by the Defendants to destroy Plaintiffs' business, oust Plaintiffs from the property damage industry, and force Plaintiffs to incur over $1.5 Million in attorneys' fees and costs in the State Court Action, including defending the TH Select and Omega action post-severance.

191. Defendants made an illegal, improper, or perverted use of process.

192. Defendants had ulterior motives or purposes in exercising such illegal, improper, or perverted use of process.

193. SFR and McGraw have been damaged as a direct and proximate result of the above abuse of process.

WHEREFORE, Plaintiffs SFR and McGraw respectfully request that this Court enter a judgment against Defendants, the Tower Hill Insurance Collective, Zinober, Nemeth, Clasen, and Prince Swift, jointly and severally, for the above compensatory and consequential damages, punitive damages, prejudgment interest, costs, and such other and further relief that this Honorable Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all Counts so triable.

Dated: August 13, 2026

Respectfully submitted,


| | |
|---|---|
| */s/ Joshua B. Alper*<br>Joshua B. Alper, Esq.<br>Florida Bar No. 59875<br>jalper@sbwh.law<br>floridaservice@sbwh.law<br>crestivo@sbwh.law<br>Andrew C. Ganz, Esq.<br>Florida Bar No. 1027890<br>aganz@sbwh.law<br>crestivo@sbwh.law<br>Shapiro, Blasi, Wasserman &Hermann, P.A.<br>7777 Glades Road, Suite 400<br>Boca Raton, FL 33434<br>Telephone: (561) 477-7800<br>Facsimile: (561) 477-7722<br>*Co-Counsel for Plaintiffs* | */s/ Ryan Downton*<br>Ryan Downton, Esq.<br>Texas Bar No. 24036500<br>THE TEXAS TRIAL GROUP, P.C.<br>875 Carr 693, Ste. 103<br>Dorado, PR 00646*<br>Telephone: (512) 680 7947<br>Email: ryan@thetexastrialgroup.com<br>*Ryan Downton, Esq. is licensed in Texas, not Puerto Rico<br>*Co-Counsel for Plaintiffs*<br>*Motion for Pro Hac Vice Admission Forthcoming* |